Argued 15 January; decided 1 April, 1901.

## MORTON *v.* DENHAM.

[64 Pac. 384.]

CONVEYANCES FRAUDULENT AS TO SUBSEQUENT CREDITORS.

1. Conveyances made in contemplation of contracting debts, with an intent to conceal the property, and for a fictitious consideration, are fraudulent as to the subsequent creditors: *Page* v. *Grant,* 9 Or. 116, and *Marks* v. *Crow,* 14 Or. 382, cited.

BURDEN OF PROOF IN FRAUD CASES.

2. In cases brought to set aside conveyances claimed to be fraudulent, the burden of proof rests on the party charging fraud.

EVIDENCE OF FRAUDULENT CONVEYANCE.

3. A review of the evidence in this case satisfies the court that the deeds in question were without consideration and void as against the plaintiffs.

PERSONAL JUDGMENT AGAINST FRAUDULENT VENDEE.

4. Where a fraudulent vendee of goods had fully disposed of the goods and of the proceeds before suit brought by a creditor of the vendor to set aside the transfer, a personal judgment therefor should not be awarded against such vendee.

From Polk : REUBEN P. BOISE, Judge.

This is a suit by Marcus Morton and George Strong, receivers of the firm of Little, Maxwell & Company creditors of James Denham & Company, a firm composed of James Denham and James D. Richardson, to set aside two deeds to sixty-eight and ninety-six hundredths acres of land situated in Polk County, Oregon, one executed and delivered by James Denham to his wife, Mary C. Denham, and the other by both to the defendant R. J. Fleming, and to cancel and set aside a mortgage upon the same property given by R. J. Fleming and wife to A. Fleming as fraudulent and void as to them, and to have the property subjected to the plaintiffs' judgments theretofore had and obtained against said firm and the members thereof. It is further sought to set aside a sale of a stock of boots and shoes by Denham & Company to Fleming, and to require the latter to account for the proceeds thereof. The defendants Denham and wife answered, in effect, that the deed by Denham to his wife was executed and delivered bona fide and for a valuable consideration, and that Mrs. Denham became and was an innocent purchaser ; that she sold and conveyed the property to Fleming for a full and adequate consideration ; that he took and received the deed in good faith, and was also an innocent purchaser ; and that A. Fleming took and received the mortgage in like good faith. Fleming answered that he purchased both the real and personal property in good faith and for a reasonable consideration, and that he paid $5,172 for the land and $3,200 for the stock of boots and shoes, which is all said

property was reasonably worth. The answer of A. Fleming is to the same purpose as that of Denham and wife. A trial was had on the merits, which resulted in a dismissal of the suit, and the plaintiffs appeal.

REVERSED.

For appellants there was a brief and an oral argument by *Messrs. Geo. G. Bingham* and *Harry J. Bigger.*

For respondents there was a brief and an oral argument by *Messrs. William H. Holmes* and *Tilmon Ford.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

James Denham and wife, Mary C. Denham, came to Salem some time in 1889. Between July of that year and August, 1890, Denham deposited in the Capital National Bank of Salem something over $15,000. A small amount was in cash, and the balance in the form of drafts upon New York and Detroit, Michigan, which the bank collected. The Michigan draft was drawn by Denham and wife. In the mean while, Denham purchased the land in question, and also a lot in Salem, taking the deed to both parcels in his own name. The consideration paid for the land was $7,000, and for the lot $2,000. He also opened up a boot and shoe business in Salem with James D. Richardson, his nephew, as a partner, under the firm name of James Denham & Company. On October 2, 1890, Denham deeded the Salem property to his wife through mesne conveyances by joining in a deed with his wife to John A. Carson, and Carson deeding to her. The consideration stated in the deed is $3,000. On March 24, 1891, the land was deeded to the wife in the same manner, the consideration stated being $10,000. On May 2 following, Denham and wife mortgaged the land to Richardson to secure

the payment of their promissory note of date March 10, 1891, for $5,500, payable six months after date, with interest at ten per cent. per annum. Business was continued in the store, and matters ran on apparently in this condition, until June 7, 1891, when Denham gave defendant Fleming a bill of sale of the stock of boots and shoes, the books of account, etc., running in this form : "I, James Denham, of the City of Salem, County of Marion, State of Oregon, doing business under the firm name of James Denham & Company,  *  *  *  for and in consideration of the sum of $5,000," etc., "do by these presents grant, bargain, sell, and convey," etc., which was recorded in the miscellaneous records of Marion County. The property was invoiced at $8,690.50, as shown by the statement attached to the bill of sale. On the same day he and his wife executed and delivered to Fleming a deed to the land, reciting a consideration of $7,000. At the same time Richardson acknowledged satisfaction of his mortgage, and both the deed and certificate of satisfaction were recorded at Dallas, in Polk County, the day following. On the eighth (the day these instruments were recorded), Denham and Fleming executed their note to Ladd & Bush for $3,200, payable in ninety days, and, to secure its payment, Fleming gave them a mortgage upon the premises, which was recorded at Dallas the following day. Fred Denham, the son of James Denham, was put into possession of the store, with authority to purchase new goods to replenish the stock and continue the business, but in the name of R. J. Fleming. The business was carried on in this manner until early in January, 1893, when the stock was sold to Leo Willis at fifty cents on the dollar of its cost price, Willis paying Fleming $3,930.40 in cash therefor. On December 23, 1897, Fleming and wife executed a mortgage upon the premises, purporting to be given as security for a note of

$4,000 of even date to his brother A. Fleming, which was recorded January 14, 1898, and this suit was instituted fifteen days later.   These facts are undisputed.

1.   Two judgments constitute the foundation of the plaintiffs' suit, one of which was recovered by E. P. Reed and Joseph Farley, June 16, 1892, in an action commenced against James Denham and James D. Richardson, July 16, 1891, and the other by Little, Maxwell & Company, February 14, 1893, in an action instituted against James Denham & Company, June 18, 1892.   The accounts which furnish the basis for the judgments were for goods and merchandise shown by plaintiffs to have been sold, in the case of Reed and Farley, to Denham & Company, April, 1891, and of Little, Maxwell & Company, between April 16 and June 11, 1891, the bulk of them on April 16.   Now, it is claimed that the conveyance of March 24, 1891, by Denham and his wife, was in anticipation of this indebtedness, and for the purpose of overreaching and defrauding these creditors, and that the execution and delivery of the deed and bill of sale to Fleming was in further consummation of the fraudulent purpose.   The fact that the claims of the plaintiffs had not yet accrued at the time of the conveyance to the wife is not conclusive against their right to have the land subjected to the payment thereof.   If the act was done in contemplation of contracting the indebtedness, and for the purpose of shielding the property, and was not bona fide, the liability attaches just as effectually as if the transfers had taken place subsequently: *Marks* v. *Crow*, 14 Or. 382, 395 (13 Pac. 55) ; *Page* v. *Grant*, 9 Or. 116 ; *Fisher* v. *Lewis*, 69 Mo. 629 ; *Mullen* v. *Wilson*, 44 Pa. St. 413 (84 Am. Dec. 461); *Burdick* v. *Gill*, 7 Fed. 668 ; *City Nat. Bank* v. *Hamilton*, 34 N. J. Eq. 158.

2.  The burden is cast upon the plaintiffs, however, to establish the fraud, and we shall now inquire whether they have succeeded.

3.  It is shown that at and prior to the time the claims accrued Denham and Richardson were also engaged in the boot and shoe business under a like name and style in Chicago, Illinois, and these purchases were made for that house.   Whether the Chicago house was in operation before March 24, 1891, does not appear.   Goods were sometimes shipped from Chicago to the Salem house. Richardson made the purchases from Little, Maxwell & Company, and Little testifies that, while thus engaged, Richardson assured him and one of the other partners that James Denham was the senior partner of the firm, and was one of the wealthiest men in Salem, and that his (Little's) firm subsequently received word from Denham confirming Richardson's statement.   On May 11, 1891, Denham wrote C. M. Henderson & Company, Chicago, that he was the senior member of the firm of James Denham & Company, that Richardson was all right, and that he told the truth regarding a transaction concerning which inquiry had been made.   These circumstances establish the fact that he and Richardson were copartners under the firm name of James Denham & Company.   Indeed, it is not now denied that they were partners in both houses, notwithstanding the bill of sale represents James Denham as doing business under such name and style. The firm carried on its business in Salem until June 7, 1891, and continued the purchase of goods in the mean while, so it may be said to be shown that it was James Denham's intention to continue contracting accounts and incurring indebtedness in connection with the conduct of the business subsequent to the transfer to his wife on March 24, 1891.

But was the transfer made with reference to that intention? This must be determined by the circumstances attending the transaction and the future treatment of the property by the parties concerned. Mr. Denham went East for some purpose, and in the early part of June, 1891, in company with his brother, called upon Fleming at his place of business in Cedar Bluffs, Nebraska, who was then the postmaster at that place, and also engaged in keeping a drug store, and made application for a loan of $3,000 or $4,000. It should be stated incidentally that Denham's brother then resided about one and one half miles from Cedar Bluffs, and was a brother-in-law of Fleming, having married his sister. Fleming testifies that he had never met Denham before, and that the conversation with him lasted but a few minutes; but the next day he came by, and he (witness) walked to the depot about three blocks away with him, and that he again wanted to know if witness could loan him some money. He said that he owed the Capital National Bank of Salem $3,000 or $4,000, and mentioned something about the security he was willing to give, providing he could get the money, and spoke about witness coming to Salem. Fleming came to Salem, whether in pursuance of any arrangements then made is not disclosed, arriving here, according to his own statement, July 7, 1891. On the same day he met Denham at Mr. Carson's office, where the bill of sale was drawn up, signed, and delivered to him, and upon that day, whether at the same time or not is not shown, the deed was given to him for the land in dispute.

Fleming further testifies that, on his arrival in Salem, Denham again applied to him for the loan, and agreed to transfer the stock of boots and shoes, and his wife agreed to transfer the farm as additional security, provided he would let them have the money; that he did

not have it here, and that there was some talk about waiting until he could get back home and then furnish it, but that he agreed to make the loan. He further states that Denham got into some trouble that day or the next with Mr. Albert, of the Capital National Bank, and that Albert was not willing to wait until the money could be obtained from the East; that he (witness) then made application to Ladd & Bush, procured the money, and went with Denham, and saw it paid to Mr. Albert; that that was the first transaction between him and Denham, but that subsequent thereto it was agreed between Denham, his wife, and witness that he should sell the boots and shoes, and, if they brought enough to pay the amount due Ladd & Bush, that he should then reconvey the land to Mrs. Denham. He then relates that he tried to sell the goods, but did not obtain a purchaser until he sold to Leo Willis, January 9, 1893; that in the mean while Fred Denham was in charge of the store, with authority from him to make purchases for the purpose of keeping up the stock; that he found, upon examination of the books, that he run witness in debt $2,400, and for this reason the proceeds of the sale were insufficient to repay him, including the amount still due Ladd & Bush; and that, in order to make up the deficit, Denham and wife paid $1,000 additional, which witness understood was the wife's money. Mrs. Denham says that Mr. Denham and herself paid Fleming that $1,000. This closes the transaction, so far as the stock of goods is concerned.

The witness, continuing, says: "At that time Mrs. Denham had importuned me on several different occasions to purchase the land, farm, out and out,—to buy it;" and, in effect, that they asked $6,000 or $7,000, but afterwards agreed to sell it for $75 per acre, and that soon after the adjustment he bought it of her for $5,172; paid her $172 in cash, and gave her his notes for the balance;

that he had since paid thereon $1,500 principal and $1,000 interest, and that he still owes her three notes, of $1,000 each, and one of $500, upon the purchase price ; that, in the fall of 1897, fearing that he would be pressed for money, he made application to his brother in Nebraska for a loan of $4,000 with which to lift the notes ; that he wrote to him on December 20, 1897, and received word that he could furnish $2,000 down, and the balance as soon as he could make a sale of some cattle ; and that thereupon he executed a mortgage, had it filed, and sent to his brother, who subsequently sent him $2,000, which he received between the fifteenth and twentieth of January, 1898, and prior to the institution of this suit. In his examination, he first answered that he got the money by means of a draft, but later he says that his brother deposited it in an Eastern bank subject to his check, and that he checked it out at different times ; that during all these negotiations he had no knowledge or information that the deed by Denham to his wife was not regular and fair ; and that what he did was in good faith, believing that she was the rightful owner of the land. On his cross-examination, he says he never paid the $2,000 procured from his brother to Mrs. Denham, and that he loaned the money out as fast as he could get it, and has it yet, except what he has spent. This suit having been commenced, the remaining $2,000 was never forwarded.

On December 23, 1895, Denham and wife signed an instrument of writing with R. J. Fleming, whereby they mutually acknowledged a satisfactory adjustment of all matters between them, and that neither party had then any claim against the other, except that Fleming was still indebted to Mary C. Denham upon four notes, of $1,000 each, giving only the dates when they would fall due. Fleming remained in Salem only about a week in June, 1891, returning and arriving at his home in Ne-

braska on June 25. He returned to this coast again, however, in the spring of 1892, and has since made his permanent residence in Salem. When the bill of sale was executed there was a show of the exchange of money evidencing a consideration paid, for such is the testimony of John Bayne. The parties say now there was no money consideration attending the transaction. Bayne further states that Fleming subsequently told him that he was not afraid of the farm, but that he was afraid of the stock of boots and shoes, that these creditors were liable to seize it, and that he was very anxious that Mr. Denham should consent to its disposal. Fleming consulted with Denham while carrying on the business at the store, and was subject, in a great measure, to his directions. The bill of sale and deed, it will be noted, were executed on the seventh day of July, and the deed was recorded on the eighth. Up to this time there had not been the exchange of a particle of consideration, notwithstanding the recitals in the documents intended to carry the title ; but on the eighth, when it was ascertained that Mr. Albert was importunate and demanded his money at once, then the mortgage was made to Ladd & Bush, and, if the position of the names upon the note count for anything, it would appear that Denham was the principal and Fleming the surety. Mr. Fleming knew at the time that Denham & Company were owing other creditors. So far as it appears, Fleming never paid Denham anything until after the stock was disposed of, and in the mean while Denham was declaring to his creditors that he had disposed of everything, and had nothing with which to meet their demands. There was no deed of the land made to Fleming, other than the one taken as security. He says, however, that it was understood that the deed made as a mortgage should stand as an absolute conveyance at the time of the adjustment of their affairs, in 1893 ; yet it

appears that the said settlement and release was not exe-
cuted until more than two years later.   The pretended
sales have not the bona fide habiliments of a mortgage,
even, unless it be that the muniments were given to secure
Fleming for the loan of his name upon paper at a time
and place when and where he was wholly unknown, and
could not have secured any credit upon his own account.
But this can not be so in the light of the testimony of the
parties themselves, and thus it appears that the instru-
ment was simply a shift to cover up the property, and
put it out of the reach of Denham's creditors.   All the
parties to the transaction seem to have been equally cogni-
zant of the real purpose.

We come now to the deed by Denham to his wife, on
March 24, 1891.   Was that a bona fide transaction, so
far as Mrs. Denham is concerned?   She and Denham
both testify that she gave up two notes which she held
against her husband, amounting to $10,000, in consider-
ation of the deed.   When asked how she obtained that
amount of money, she says she made it keeping boarders,
teaming, and selling stock and farm produce while in
Vermont;   that between 1877 and 1886, she made $6,000
in this manner, which had been loaned for three years,
at six per cent, and that the accumulations thereof she
loaned to her husband for three years,—that is, from
1886 to 1889,—which at the end of that time amounted
to over $8,000 ;   that her husband still held the latter
amount for about a year and nine months, which ran up
to over $9,000, and that she loaned him $1,500 additional,
which she had accumulated at other times.   Mr. Denham
is more exact.   He states the accumulation in 1886 to be
$7,080.   This he held for three years, at six per cent
interest, increasing it to $8,354, which latter amount he
continued to hold for a year and nine months longer,
running it up to over $9,000, and that his wife loaned

him $1,500 besides.   When the deed was made by Denham to his wife, October 2, 1890, for the lots in Salem, she says he owed her $12,000, and in consideration of the deed she indorsed the interest and part of the principal upon the note, but does not say how much there was indorsed.   Aside from this testimony, it appears that the wife had some control of the funds that came into the Capital National Bank ;  for Albert says she joined with her husband in the draft on Detroit, Michigan, for $3,500. All the money and drafts, however, were deposited in Denham's name, and drawn and used by him, and it would appear from their own testimony that the loans of money spoken of were made to her husband long prior to this time.   So that the fact of her having joined in drawing this money would not substantiate the claim of a prior loan of funds to the husband.   As an attempted corroboration of the statement touching the accumulation of this large amount of money, what purports to be a lengthy statement of account, showing receipts for board and produce, seems to have been attached to her testimony, without any attempt to produce the books of original entry or to otherwise substantiate it.   Indeed, all the reference made to it in the testimony is contained in the expression, ''which you see by my account,'' made use of by Mrs. Denham.   In view of the manner in which the account comes to us, it can not be considered.   There is, it must be admitted, some plausibility attending the representations touching the accumulation of these funds, and the use made of them in the purchase of the property by Mrs. Denham from her husband, but there is very much that goes to their discredit.   Both the lot upon which Denham and wife had their home and the land were purchased in the first place in the name of Denham, while, if their testimony be true, he was heavily indebted to his wife.   This is a very unusual circumstance, espe-

cially as it respects the home.   As it concerns the conveyance of the land, Mr. Carson says there was not one cent of consideration passed between the parties.   If, therefore, there was such a consideration as they state, it was not disclosed to him.   In May subsequent to the execution of the deed to the land, Mrs. Denham and her husband gave Richardson the mortgage on the premises, purporting to secure a note of $5,500, which she and her husband had executed to him on March 10 prior.   Richardson, it must be borne in mind, is a nephew of Denham's.   The mortgage appears to have been canceled on the day the deed was made to Fleming, a day before the money was borrowed of Ladd & Bush, and long before the time when the note which it was presumably made to secure fell due.   There was no money passed from Fleming with which to satisfy this mortgage, and there is no attempt to explain its mysterious advent and exit in the course of events.   Of course, it constituted an apparent lien upon the land in the mean while.   On the day following, Denham attempted to sell the land to Albert for the purpose of discharging the debt at his bank, and it is not denied that it was with her assent.

A very suggestive circumstances attending the transaction is that Mrs. Denham evidently knew that Fleming was making no advancement of money whatever for their accommodation ; that Mr. Denham and herself, with security available, could have easily negotiated the loan with Ladd & Bush without the instrumentality of Fleming, and that, for the purpose of a fair and open transaction, he was a perfectly superfluous and useless agent ; that the transaction was not a sale, as it purported to be ; that Denham intended to continue the boot and shoe business, which he afterwards did, in the name of Fleming ; and that the conditions thus brought about would have the effect to delay and defeat the rights of the hus-

band's creditors. The very fact that she assented to what she claims was her property going into such a scheme is pursuasive, showing that she did not feel safe in her own title, notwithstanding it was incumbered by the mortgage to Richardson for all it was worth, and detracts vitally from the pretension of good faith attending the deed from her husband to her. We are strongly impressed, from a survey of the whole testimony, that none of these transactions, including the deed of the land to Mrs. Denham, and the mortgage by Fleming to his brother, were consummated in good faith. The ways have been too devious to evidence fair dealings ; hence we think both deeds should be set aside,—that from Denham to his wife and from his wife to Fleming,—together with the mortgage to A. Fleming, and the land subjected to the payment of the plaintiffs' demands ; and such will be the decree of the court.

4. It is urged that the decree should go against Fleming personally for a money demand, as he received the proceeds of the goods disposed of by him. But he had parted with those funds before suit was instituted, and hence a personal decree would not be appropriate : Wait, Fraud. Conv. (3 ed.), § 177. The decree of the court below will be reversed, and one here entered in accordance with this opinion.    REVERSED.