Argued November 29, 1938; reversed January 31, 1939

BAYS ET AL. *v.* BROWN ET AL.

(86 P. (2d) 951)

W. C. *Winslow*, of Salem, for appellants.

B. G. *Skulason*, of Portland (Skulason & Skulason, of Portland, on the brief), for respondents.

ROSSMAN, J. This is an appeal from a decree of the circuit court in favor of the three defendants, entered in a creditor's suit instituted for the purpose of setting aside two bills of sale which the plaintiffs aver Glen Brown and Ethel Fuller, two of the defendants, executed and delivered to the third, Harry Neubeiser, for the purpose of hindering, delaying and defrauding the vendors' creditors. The instruments described as the property conveyed the furnishings of the Bays Hotel in McMinnville in which the vendors each had a half interest. Each instrument purported to convey to Neubeiser a half interest.

The above-mentioned bills of sale are dated April 10, 1936. On that day the defendants Brown and Fuller were indebted to the plaintiffs for a conversion of property which occurred in 1934; and on April 28, 1936, in an action which was pending April 10, 1936, the plaintiffs recovered judgment against those two defendants in the sum of $4,543.50. Their claim is within the contemplation of § 63-507, Oregon Code 1930, which renders void as to creditors transfers intended to hinder them: *Seed v. Jennings*, 47 Or. 464, 83 P. 872, and

*Hillsboro National Bank v. Garbarino,* 82 Or. 405, 161 P. 703. A writ of execution was promptly issued and was returned unsatisfied. December 11, 1936, this suit was instituted.

Virtually the only testimony taken was given by the defendants Brown, Fuller and Neubeiser, who were called by the plaintiffs. They were not cross-examined. The three swore that the purchase price of the property was $2,900, and that it was evidenced by a note for $500 and two contracts, each in the denomination of $1,200, one payable to the defendant Brown and the other to the defendant Fuller. These contracts provided for 24 monthly payments of $50 each, the first due May 10, 1936. At the time of the purported sale no cash was paid. The $500 note was not produced, but the three defendants swore that it was paid. Neither Brown nor Mrs. Fuller could recall the time of its payment, but Brown thought he received half of it "along in July, 1936." Neubeiser believed he paid the note "the last of June some time." He swore he paid it with cash. It is clear that all, or virtually all, of the money with which it was paid, assuming that such a note ever existed, came out of the earnings of the hotel. The defendant Neubeiser, prior to this transaction, had worked for the other two defendants in this hotel, which was a small affair of only 32 rooms.

In an apparent effort to show that Brown and Mrs. Fuller had concealed their money and other property, the plaintiffs questioned them pointedly. Brown, who testified, "I have been in lots of different businesses," swore that in 1935 he owned a McMinnville auto service station and that in the same year he sold it for $1,000. Although he at first insisted, "but I never got my money," after much questioning qualified the answer by admitting that he actually received $900

of the consideration. Although certain that he had a bank account at that time, he was not sure of the institution's identity. He testified that "at that time I didn't" deposit the $900, and added, "I put a little bit in there at a time. I never put it all in at any one time." Brown's next venture was the purchase of a McMinnville hotel known as the Oregon Hotel. This he sold, however, in February, 1936, for a consideration which he described as follows: "I think—I rather— think it was $4,000, I am not sure." He was equally uncertain as to the manner in which the consideration was paid, first saying that as a down payment, "I got $500," then qualified that by saying, "Well, I just got some checks. They weren't to be cashed." He at first denied that he had deposited the $500 in his bank account, but shortly qualified the denial thus: "I don't remember whether I did or not," and, finally, indicated that he never deposited any of it by saying that he carried some of the money around in his pockets and hid some of it "in the hotel." It next developed that the ownership of the hotel was a joint enterprise and that Mrs. Fuller owned a half interest in some of the furnishings. After this fact came to light Brown answered, "Yes, I think that is it" to a question which inquired, "The two of you got $500 first; the second $3,500, or $1,750 each; and then you got some notes which you cashed to Otto Heider of $750 each?" He claimed that the $3,500 second payment was consumed in the discharge of bills and in the purchase of furniture for the above-mentioned Bays Hotel. At first he replied, "No, I don't think I can" when asked to give the names of some of the accounts he paid with this money, but next, after saying that he could give the names of "some of the largest ones," mentioned taxes and an account of "the Miller Electric Company." He was not sure of

the size of either of these bills, but thought that both were "around a couple hundred dollars." The best he could do concerning the other bills was to declare that they were owed to "some of the furniture companies." He recalled neither names nor amounts. It will be observed that the last item of the Oregon Hotel's sale price was two notes of the denomination of $750 each, one being received by Mrs. Fuller and Brown. These were discounted, as already indicated, to one Heider. After Brown had declared that he could not recall the time when the notes were discounted, he was asked, "Just before we went to trial on that conversion case, wasn't it?" to which he replied, "I presume it was." He thought that Mrs. Fuller and he received from Heider about $100 less than the face of the two notes which were conditional sales instruments with title reserved. It will be recalled that he had a bank account at one time. He was unable to state more specifically the time it was closed than to say "when my money ran out." Apart from claiming that he had many bills, he could not further describe the disposition he had made of the funds which he had received from the above ventures.

It will be recalled that no down payment was made at the time of the sale, unless Neubeiser's purported $500 note be deemed such. Neubeiser, according to Brown, was the clerk of the hotel "for a while * * * I really don't remember just how long." Brown, referring to the note, first said, "I gave it back to him when he paid the note." Then he swore, "I didn't give it back to him, Mrs. Fuller gave it to him." Next, he added, "She had it all the time," and, finally, concluded the matter by testifying, "I had the note first." He claimed that the first he knew about the note's payment

was when Mrs. Fuller handed him $250 in bills as his half of the payment.

Brown swore that Mrs. Fuller and he operated the hotel together and described his part of the work as follows: "I would work behind the desk; I did the plumbing and electrical work and the janitor work and the chambermaid work, and putting down the carpets." Having so testified, he was asked whether, after the purported sale to Neubeiser, any change was apparent from outside appearances, and replied, "Couldn't prove it by me because I wasn't there." Shortly he qualified this answer by testifying that in April, 1936, he stopped at the hotel "for a few days" while the above-mentioned action was on trial. Although at first he claimed that he could not recall whether he saw Mrs. Fuller busying herself about the operation of the hotel at that time, he finally admitted that in this period she "did do some work around there." Next, he testified, "I was interested in seeing Harry (Neubeiser) put the hotel over," and "naturally if there was anything I could do, I did it." He did not disclose whether Neubeiser paid him anything for his work. He claimed that after the sale he secured employment as the operator of a steam shovel at the rate of $1.50 per hour. He swore that he had no bank account, and in accounting for his weekly wage said that he "spent it."

It will be remembered that the purported sale to Neubeiser was made April 10, 1936. Nevertheless, all admitted on December 15, 1937, when the testimony was taken, that Neubeiser had made no payments upon his contract of purchase except the alleged $500 payment. We add that, according to Brown, "he (Neubeiser) just kept up the payments on the furniture;" that is, payments to the original vendors. Thus, al-

though only 24 payments were to be made 20 were already in default.

Neubeiser claimed that he had known his two co-defendants for about three years and that he had worked for them two or three months. He swore that on April 10, 1936, "I didn't have any money," no bank account, and "no property," but shortly qualified his answer by saying that he had $125 or $150 "on my person." He admitted that no cash was paid at the time, but thought that "the last of June some time" he paid the note. He could not produce it. He admitted that after the $500 payment he made no more, saying, "All I did towards my contract was keeping up the payments on the old contracts that they owed." He pointed out that he made these payments out of money coming in to the hotel.

Mrs. Fuller also admitted that she had no bank account, but thought that during the operation of the Oregon Hotel there was an account in the name of that concern which she and Brown used. She swore that when the initial payment of $500 was received upon the sale of the Oregon Hotel it was not deposited until receipt of the second payment amounting to $3,500. She could not recall the name of the bank and was not certain whether the entire $4,000 was deposited. She claimed that after the receipt of this money many checks were written in payment of bills, but gave the name of no creditor. She could not recall the approximate amount of the total disbursements, but was sure that something was left and with this she thought that some articles of furniture were purchased for the Bays Hotel. Mrs. Fuller testified that in April, 1936, (the purported sale to Neubeiser was April 10) she remained in the hotel "most of the time. * * * Mrs. Neubeiser was sick, and I helped." Then she and

Brown took a trip during the course of which "we were back several times." After the trip, "I came back there and did chambermaid work." If she was paid anything for her work she failed to mention the sum. At the time of the trial she admitted that she was still working in this hotel, explaining, "Once in a while I help at the desk when Mr. Neubeiser is sick or he wants to get away."

The only other testimony given was that of one of the plaintiffs, Bessie Bays, and of the court reporter, Miss H. J. Bratzel. Mrs. Bays testified that in April, 1936, "I was in and out of McMinnville quite a bit," and visited in the Bays Hotel on one occasion after April 10. She testified that after April 10 Mrs. Fuller "was behind the desk" as previously. She observed no difference in the appearance of things, and thought that Neubeiser's activities were the same after the purported sale as before. The testimony of the court reporter consisted of reading an excerpt of the testimony given by Brown in the previous action in which he swore that Mrs. Fuller had no interest whatever in the furnishings of the Bays Hotel.

Neither Mrs. Fuller nor Brown made any effort whatever to explain how it happened that they decided to sell the Bays Hotel, let alone a sale to one who had no property, no bank account, made no down payment, and provided no security for his $500 note. Neubeiser gave no reason for his purchase. Since immediately following the purported sale Mrs. Fuller and Brown remained in the hotel and assisted in its operation, they apparently had no desire to leave McMinnville at that time, and, hence, such a possible explanation is precluded. Likewise, after the period just mentioned the two took some short trips about the state frequently returning to the hotel. Since these were pleasure trips they ap-

parently were not lacking in funds and, hence, the inference follows that it was not need for funds which dictated the sale. Brown, apart from his quoted answer, made no mention of Neubeiser's long-continued default. Mrs. Fuller did not mention the subject at all. The fact that they permitted twenty-one months to pass in which they obtained nothing from this purported sale except the $500 is another strong indication that the reason for the sale was not need for money. Again, they would have received this $500 whether they had sold or not, because it was paid them from the current income from the hotel. The very fact, however, that during the course of the twenty-one months they permitted twenty successive defaults in monthly payments, which were secured by nothing except hotel furnishings—a type of property which deteriorates rapidly—is a circumstance worthy of mention; yet they made no mention of it.

In the preceding paragraphs we have stated the only explanation which Mrs. Fuller and Brown made of the disposition of the funds which they received from the two hotel sales, and also the funds which Brown received from the sale of his filling station.

It appears to us that this transaction, as described by the three individuals who participated in it, abounds in such discrediting incidents as generally characterize pseudo transactions. Even the narrative itself, especially Brown's part of it, has the facial features which generally mark the guilty; contradictions, answers impossible of belief, and the frequent use of those refuges of persons who desire to conceal—"I don't know," "I am not sure," "I don't remember whether I did or not," etc.

The transaction is at variance with the normal run of business experience. Sales of valuable hotel furnishings are not made to buyers who have no property

and no bank account, and who cannot pay down a red cent. Ordinarily, vendors do not accept as the first payment on such property the unsecured note of a person who possesses nothing; nor do prudent persons who have sold property subject to constant wear and resulting deterioration sit by supinely and permit twenty-one successive defaults in monthly installments; especially not when the only sum which they have received upon the account was produced by the property itself. In the ordinary course of business we do not find running through transactions a ''now you see it, now you don't'' bank account of the kind described by Brown. Bank accounts do not vanish without leaving behind them any trace of time, size and identity. Nor do they vanish so completely that the one who held them produces no cancelled checks or deposit book. Further, those who are straightforward and have nothing to conceal experience no serious difficulty in recalling the names of their large accounts and the more important transactions in which they engaged. Few persons who had sold a filling station and two hotels in the course of a few months' time would be ignorant of whether profits had been made as a result of the transactions and the disposition which had been made of the proceeds of the sales. Men who are honest when charged with fraud are not content with merely casting over the challenged transaction an atmosphere of doubt — they are determined to clear their names.

The defendants' brief considers one by one the badges of fraud which the evidence imputes to this transaction and shows by the decisions of courts that this badge or that one was present in a transaction which withstood judicial scrutiny. If in this case only one or two suspicious circumstances were present, in all

likelihood we would be bound to conclude that the plaintiffs had not discharged the burden of proof. But the evidence before us shows (1) haste; (2) transfer on the eve of the trial; (3) transfer to an employee; (4) no change in outward appearances; (5) this transaction occurred about the time the $750 notes were disposed of; (6) the transfer rendered the supposed vendors judgment-proof; and (7) acceptance of a note from the purported buyer who had neither a bank account nor any property, and who was permitted to default in the payment of twenty successive installments. Finally, a very convincing circumstance is the fact that after the testimony of the three participants in this transaction disclosed all of these badges of fraud the defendants did not resume the stand for the purpose of showing that this was a genuine transaction and not a mere paper one. If there was any explanation which when made would show that the transaction was genuine, the proof was in the sole custody of the defendants. The fact that they chose silence is persuasive proof that there existed no evidence favorable to them. Of course, it was necessary for the plaintiffs to show that Neubeiser participated in the fraud, but since fraud is generally incapable of proof by direct evidence, circumstantial evidence suffices; and a plaintiff need not prove that the grantee had actual knowledge of the improper purpose; it is sufficient if he had knowledge of facts and circumstances which would excite suspicion in the mind of a prudent man. In our opinion, Neubeiser had such knowledge. It is our opinion that the transaction was fraudulent, and that its purpose was to hinder and delay the creditors of Mrs. Fuller and Brown.

The defendants contend: "A creditor must obtain a lien on the property before the transfer can be said to interfere with his rights, or he has any title to claim

relief in equity  *  *  *. The plaintiff to set aside a transfer as fraudulent must have a lien on the specific property in question.

■■ It will be remembered that the conversion action was pending when the fraudulent transfer was made; in fact, the transfer was made only eighteen days before judgment was entered. It will be further recalled that a writ of execution had been issued and had been returned unsatisfied before this suit was instituted. In *Dawson v. Sims*, 14 Or. 561, 13 P. 506, Mr. Chief Justice LORD, in delivering the opinion of this court stated:

"In Dawson v. Coffey, 12 Or. 519, Waldo, C. J., said: 'It is exclusively in the province of a court of law to say there is a legal debt, and that it cannot be made at law. Therefore, a creditor's bill "must be preceded by a judgment at law, establishing the measure and validity of the demand of the complaint for which he seeks satisfaction in chancery." ' * * * Except to satisfy a claim out of some fund accessible only in equity (Hodges v. Silver Mining Company, 9 Or. 202), the impression has heretofore remained with me that the claim must be first established at law before the equitable jurisdiction can be invoked. It is admitted that the object of a creditor's bill is not to ascertain or determine the amount and validity of a claim or debt, or to undertake the enforcement of its payment or collection; as it is the exclusive province of a court of law to establish that there is a legal debt, and that it cannot be made at law, but that when it is thus established by judgment, and legal remedies are inadequate to enforce its collection against the property of the debtor on account of fraudulent impediments or conveyances, equity will lend its aid, by means of a creditor's suit, to remove them. In such case its existence is purely auxiliary, and designed only to remove the fraudulent obstructions which prevent the execution from laying hold of the property, and applying it to the payment of the judgment. 'The creditor must obtain a judgment,' says Mr. Bump, 'issue an exe-

cution and procure a return *nulla bona*, before he can file a bill in equity to obtain satisfaction out of the property of the debtor which cannot be reached at law.' This seems to indicate that before the equity jurisdiction can attach, there must be a judgment which the law cannot enforce against the property of the debtor; in other words, that the remedy in equity is given in such case because the legal remedies are inadequate. Can this be known before a judgment has been obtained and execution returned *nulla bona*?''

The court concluded that lien created by an attachment levied upon the property of the debtor suffices as a foundation for a creditor's suit in those instances in which the creditor does not possess a judgment. From *Seed v. Jennings*, supra, the following is taken:

''To enable a creditor herein to maintain a suit to set aside a conveyance by the debtor as fraudulent and void, he must show an unsatisfied judgment or an attachment upon a cause of action existing at the time of the conveyance (Dawson v. Sims, 14 Or. 561, 13 Pac. 506; Clark v. Anthony, 31 Ark. 546); or on a cause of action arising subsequent thereto, and that in the latter event the conveyance was made with the express intention of defrauding subsequent creditors: Crawford v. Beard, 12 Or. 447 (8 Pac. 537); Bennett v. Minott, 28 Or. 339 (39 Pac. 997, 44 Pac. 288); Morton v. Denham, 39 Or. 227, (64 Pac. 384.)''

This court has consistently declared that a creditor who has established his claim by a judgment or who has acquired a lien by attachment may maintain a suit of this character. See especially *Fleischner v. First National Bank*, 36 Or. 553, 54 P. 884, 60 P. 603, 61 P. 345, and *First National Bank v. Manassa*, 80 Or. 53, 150 P. 258, in each of which a judgment sufficed. See also *Ruth v. Cox*, 134 Or. 200, 291 P. 371; *Wiggins Co., Inc., v. McMinnville M. C. Co.*, 111 Or. 123, 225 P. 314; *Mat-*

*lock v. Babb*, 31 Or. 516, 49 P. 873; and *Bennett v. Minott*, 28 Or. 339, 39 P. 997, 44 P. 288.

We are clearly satisfied that the plaintiffs' judgment which was obtained before the institution of the present suit, together with the return of the writ of execution unsatisfied, afforded a sufficient foundation for this suit.

It follows from the above that the circuit court erred in entering the decree from which this appeal was taken. The cause will be remanded with instructions to enter a decree cancelling the bills of sale.

RAND, C. J., and KELLY, BELT, BEAN, BAILEY and LUSK, JJ., concur.