## McKinster v. Sager.

[No. 20,377.  Filed December 16, 1904.]

CONSTITUTIONAL LAW.—*General Grant of Legislative Power.*—*Rights of Personal Liberty and Private Property.*—No court under our system of jurisprudence is warranted in assuming that by a general grant of legislative authority the legislature can strike down the rights of personal liberty and the rights of private property.  *p. 675.*

SAME.—*Magna Charta.*—*"Law of the Land."*—The "law of the land" as used in *Magna Charta* was intended to extend the rights and benefits of the law to all alike, and not to give some of the citizens greater rights than others, and our federal constitutional provision of "due process of law" means the same as the "law of the land" in *Magna Charta.* *p. 675.*

SAME.—*Declaration of Independence.*—*Constitution.*—*How Connected.*—While the Declaration of Independence does not have the force of law, yet the Constitution must be read in the light thereof and the spirit of the Declaration applied to it.  *p. 677.*

SAME.—*Right of Private Property.*—The English law has always recognized and sacredly guarded the citizens' rights in private property, and constitutional provisions must be construed to secure and safeguard such rights.  *pp. 678, 679.*

SAME.—*Liberty.*—Liberty does not imply mere freedom from physical restraint, but it includes the right of the individual in the free and reasonable enjoyment of all his faculties consistent with a like enjoyment by others.  *p. 679.*

SAME.—*Due Process of Law.*—The effect of the guaranty of due process of law and of the equal protection of the laws is to prevent the state from exercising, by any of its departments, arbitrary and capricious power over persons or property.  *p. 680.*

SAME.—*Sales of Merchandise in Bulk.*—*Act of 1903 is Unconstitutional.*—*Class Legislation.*—*Unequal Protection of Laws.*—The act of 1903 (Acts 1903, p. 276) prohibiting the sales of merchandise in bulk, except under certain conditions, and providing that a sale without complying with such conditions shall be void as to such vendor's merchandise creditors and his other creditors whose money such vendor had borrowed and actually used in such business, is unconstitutional and void as in violation of the fourteenth amendment of the federal Constitution, since it is class legislation, favoring one class of creditors by granting a superior lien on all the goods, and denies all citizens the equal protection of the laws, giving favored ones a preference on execution.  *pp. 685, 686.*

From Bartholomew Circuit Court; *F. T. Hord,* Judge.

Action by William D. Sager against Eldridge L. McKinster. From a judgment for plaintiff, defendant appeals. *Reversed.*

*Everroad & Cooper*, for appellant.

*John Rynerson, John W. Morgan, Charles W. Smith, John S. Duncan, Henry H. Hornbrook* and *Albert P. Smith*, for appellee.

GILLETT, J.—Appellee was the plaintiff below. His complaint was based on the provisions of an act of the General Assembly approved March 9, 1903 (Acts 1903, p. 276). The record raises the question as to the constitutionality of that act. All of the essential provisions thereof are found in the first section, which, omitting the enacting clause, is as follows: "That it shall be unlawful for any merchant engaged in the buying and selling of merchandise, while he is indebted to any person who has in good faith given him credit for merchandise sold to him and to be used by him in the conduct of his business, or to any person for money loaned to him to be used in 'the conduct of such business, and which has been actually used in said business, to sell his entire stock of merchandise in bulk, or to sell the major portion thereof in value in one or more parcels or to one or more persons for the purpose and with the intention of ceasing to conduct said business in the same manner and at the same place as he has theretofore conducted the same, without first making a full and complete inventory of the merchandise so proposed to be sold, in which inventory the values shall be extended at the ruling wholesale market price thereof; and making a full, true and correct schedule of all persons to whom he is indebted for merchandise so sold to him and of all persons to whom he is indebted for money loaned to him to be used in the conduct of such business, and which has been used therein, stating therein the postoffice address of each of said creditors and the amount owing to each of them; to which inventory and schedule there shall be attached the oath of

McKinster v. Sager.

the seller that the same is true and correct; or if the seller shall assert that he is not indebted to any person of the classes above designated, he shall make an affidavit to that effect and deliver the same to the purchaser with the inventory as hereinafter provided. The seller shall deliver said inventory and schedule to the proposed purchaser and shall retain exact copies thereof in his own possession; the seller and the purchaser shall each preserve such inventory schedule and affidavit for the period of six months after such sale and purchase and the same shall be open to the inspection of the creditors of the seller. Five days before such sale shall be consummated and before the purchaser shall take possession of the merchandise so proposed to be sold the seller and proposed purchaser shall join in giving written or printed notice of the proposed sale and purchase of such merchandise to each of the creditors named in such schedule; such notice may be delivered in person to such creditors or transmitted to them by registered letter through the United States mail by being deposited in the United States postoffice at the place where the seller has heretofore conducted business, or nearest thereto, properly addressed to the respective creditors at the postoffice address given in such schedule, with proper postage affixed; such notice shall state the aggregate value of the merchandise proposed to be sold as shown by such inventory, the consideration to be paid therefor, and the time and manner of making such payment. If said seller shall fail to make such inventory of such merchandise; or if such inventory shall fail to state the true value of said goods as above required; or if said seller shall fail to make such true schedule of creditors as hereinbefore provided, and the purchaser shall have knowledge of the fact; or in event the seller shall assert that there are no debts of the character above specified; if the purchaser shall fail to require the affidavit above provided; or if the seller and purchaser

shall fail to give each of said creditors named in said schedule the notice above required in the manner above provided; or if such notice shall not correctly state the amount of such merchandise proposed to be sold and the consideration to be paid therefor, and the time and manner of making the same; then and in either of such events such sale shall be deemed fraudulent and void as against the creditors of such seller on account of merchandise sold to him and money loaned to him to be used in the conduct of said business, and actually used in said business, and the merchandise in the hands of the purchaser, or any part thereof, if it shall be found in his hands, shall be liable to such creditors, and in event the same or any part thereof shall be withdrawn by said purchaser, then the purchaser himself, personally, shall also be liable to said creditors of such seller to the extent of the value of the merchandise so received by him and thus withdrawn."

In the case of *Sellers* v. *Hayes* (1904), *ante*, 422, we had occasion to consider the underlying question in this case, but the importance of the principle involved is, as we believe, a sufficient reason for a further opinion upon the subject.

We have little doubt that the act is in violation of our state Constitution, but, as we are persuaded that it contravenes the fourteenth amendment to the federal Constitution, we prefer to consider the case from that view-point.

After the opening language relative to national citizenship and its rights, the amendment contains the following language: "Nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." It is settled that the adoption of said provisions did not carry into the framework of our government any new principle. The amendment is merely a check, and, as its terminology and meaning come from and are revealed by the past, we may appropriately (and for an

especial reason in this case) refer to history in consider-
ing the question whether the act before us is in contraven-
tion of the amendment.

As was well said by Mr. Justice Story: "That govern-
ment can scarcely be deemed to be free, where the rights of
property are left solely dependent upon the will of a legis-
lative body, without any restraint. The fundamental
maxims of a free government seem to require that the
rights of personal liberty and private property should be
held sacred. At least, no court of justice in this country
would be warranted in assuming that the power to violate
and disregard them—a power so repugnant to the common
principles of justice and civil liberty—lurked under any
general grant of legislative authority, or ought to be im-
plied from any general expressions of the will of the peo-
ple." *Wilkinson* v. *Leland* (1829), 2 Pet. 627, 658, 7 L.
Ed. 542. See *State, ex rel.,* v. *Jameson* (1889), 118 Ind.
382, and separate opinion by Elliott, C. J., page 400;
*State, ex rel.,* v. *Fox* (1902), 158 Ind. 126.

There is an absence of high-sounding phrases concerning
freedom in *Magna Charta,* probably for the reason that it
was largely declaratory of the fundamental law of Eng-
land. 1 Blackstone's Comm., *127; Coke's Inst. (Second
part), *Proeme.* The significance of the instrument depends
largely upon the fact that its stipulations were wrung from
the hands of an unwilling king, by men with arms in their
hands. Hence it is regarded as an historical monument of
right, and it is called the palladium of English liberty.
The twenty-eighth chapter of Magna Charta, which Black-
stone says "alone would have merited the title it bears of
Great Charter," provides: "No freeman shall be taken, or
imprisoned, or be disseised of his freehold, or liberties,
or free customs, or be outlawed, or exiled, or any otherwise
destroyed; nor we will not pass upon him nor condemn
him, but by lawful judgment of his peers, or by the law of
the land. We will sell to no man, we will not deny or defer

to any man, either justice or right." (As it now appears in the Statutes at Large.) Concerning the expression "the law of the land," Lord Coke has pointed out that it was not said in the Great Charter "law and customs of the king of England, lest it might be thought to bind the king only, nor of the people of England, lest it might be thought to bind them only, but that the law might extend to all, it is said by the law of the land, i. e., England." 2 Coke's Inst. (Second part), *51.

. In the old case of *Nightingale* v. *Bridges* (1689), 1 Shower *135, it appears that counsel for the plaintiff, in arguing the cause, said that it was a "fundamental rule, that in life, liberty, and estate, every man who hath not forfeited them, hath such a right that the law allows him to defend, and means for so doing, that if it be violated, it gives an action to redress the wrong and punish the wrongdoer. The law is the highest inheritance which the king hath, for by it the king and all of his subjects are ruled, and if the law were not, there would be neither king nor inheritance. The kings of England have always claimed a monarchy royal, not a monarchy seignoral; 'under the first the subjects are freemen, and have a propriety in their goods, and freehold in their lands, but under the latter they are villains and slaves;' and, my lord, this propriety was not introduced into our land, as the result of princes' edicts, concessions and charters, but was the old fundamental law, springing from the original frame and constitution of the realm."

As far back as the year 1819, Mr. Justice Johnson said, in *Bank of Columbia* v. *Okely,* 4 Wheat. 235, 244, 4 L. Ed. 559: "As to the words from *Magna Charta,* incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained

by the established principles of private rights and distributive justice."

It is well settled that under the modern law the phrases "law of the land" and "due process of law" are identical in import. *Murray* v. *Hoboken Land, etc., Co.* (1855), 18 How. 272, 15 L. Ed. 372; *Davidson* v. *New Orleans* (1877), 96 U. S. 97, 24 L. Ed. 616; *Hurtado* v. *California* (1883), 110 U. S. 516, 28 L. Ed. 232; Cooley, Const. Lim. (7th ed.), 502; Pomeroy, Const. Law (3d ed.), §245.

It was said by Mr. Justice Brewer, speaking as the organ of the court in *Gulf, etc., R. Co.* v. *Ellis* (1897), 165 U. S. 150, 159, 17 Sup. Ct. 255, 41 L. Ed. 666: "The first official action of this nation declared the foundation of government in these words: 'We hold these truths to be self-evident: that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.' While such declaration of principles may not have the force of organic law, or be made the basis of judicial decision as to the limits of right and duty, and while in all cases reference must be had to the organic law of the Nation for such limits, yet the latter is but the body and the letter of which the former is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended, to secure that equality of rights which is the foundation of free government." There is no doubt that the words life, liberty, and property, as used in both the fifth and fourteenth amendments, were used as representative terms. Story, Constitution (4th ed.), §1950. Of these words, liberty is undoubtedly the most comprehensive. "In a general way," says an authoritative writer, "it may here be stated as an explanation—not offered as a definition—that when the term civil liberty is used, there is now always meant a

high degree of mutually guaranteed protection against interference with the interests and rights held dear and important by large classes of civilized men or by all the members of a state, together with an effectual share in the making and administration of the laws as the best apparatus to secure that protection, and constituting the most dignified government of men who are conscious of their rights and of the destiny of humanity. We understand by civil liberty not only the absence of individual restraint, but liberty within the social system and political organism— a combination of principles and laws which acknowledge, protect and favor the dignity of man." And again that writer says: "We come thus to the conclusion that liberty, applied to political man, practically means, in the main, protection or checks against undue interference, whether this be from individuals, from masses, or from government. The highest amount of liberty comes to signify the safest guarantees of undisturbed legitimate action, and the most efficient checks against undue interference." Lieber, Civil Liberty and Self Government (Woolsey's 3d ed.), 24, 29.

"The third absolute right, inherent in every Englishman," says Blackstone, in 1 Comm., *138, "is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land." Writing in a more philosophical spirit, Kent thus expresses himself: "There have been modern theorists who have considered separate and exclusive property, and inequalities of property, as the cause of injustice, and the unhappy result of government and artificial institutions. But human society would be in a most unnatural and miserable condition if it were possible to be instituted or reorganized upon the basis of such speculations. The sense of property is graciously bestowed on mankind for the purpose of rousing them from sloth, and stimulating them to action; and so long as the right of acquisition is exercised in conformity to the social rela-

tions, and the moral obligations which spring from them, it ought to be sacredly protected. The natural and active sense of property pervades the foundations of social improvement. It leads to the cultivation of the earth, the institution of government, the establishment of justice, the acquisition of the comforts of life, the growth of the useful arts, the spirit of commerce, the productions of taste, the erections of charity, and the display of the benevolent affections." 2 Kent's Comm. (13th. ed.) *319.

It was said in *People* v. *Gillson* (1889), 109 N. Y. 389, 398, 17 N. E. 343, 4 Am. St. 465: "The term 'liberty' as used in the Constitution is not dwarfed into mere freedom from physical restraint of the person of the citizen as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare." It is not every equal law which is a just law, but, within limits, it may be said that equality is an attribute of liberty. In pronouncing the opinion of the court in *United States* v. *Cruikshank* (1875), 92 U. S. 542, 555, 23 L. Ed. 588, Mr. Chief Justice Waite made use of the following language: "The equality of the rights of citizens is a principle of republicanism. Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle, if within its power." It was said in *Yick Wo* v. *Hopkins* (1885), 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, that the guaranty of the equal protection of the laws is a pledge of the protection of equal laws.

The guaranties found in the fourteenth amendment with respect to life, liberty, property, and equality are not to be treated as amounting to a composite, yet, taken together, they clearly evince the general purpose of the limitations. There seems to have been something of this view in the mind of the federal Supreme Court when it said in *Barbier* v. *Connolly* (1885), 113 U. S. 27, 31, 5 Sup. Ct. 357,

28 L. Ed. 923: "The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses."

The effect of the guaranty of due process of law and of the equal protection of the laws is to prevent the state from exercising, by any of its departments, arbitrary and capricious power over persons or property. *Ex parte Virginia* (1879), 100 U. S. 339, 25 L. Ed. 676; *Yick Wo* v. *Hopkins, supra; Dent* v. *West Virginia* (1888), 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; *Duncan* v. *Missouri* (1894), 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485; *Gulf, etc., R. Co.* v. *Ellis* (1897), 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; *Holden* v. *Hardy* (1898), 169 U. S. 366, 18 Sup. Ct. 383, 42, L. Ed. 780. The law of the land or due process of law can not be taken to be the very act of legislation which wantonly deprives a person of his rights. *Wynehamer* v. *People* (1856), 13 N. Y. 378. In *Loan Assn.* v. *Topeka* (1874), 20 Wall. 655, 662, 22 L.

Ed. 455, Mr. Justice Miller declared that there are rights in every free government which are beyond the control of the state, and, in continuing, the learned judge said: "A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is, after all, but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less a despotism. It may well be doubted if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness, and the security of which is essential to that happiness, under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man than by many." See, also, De Tocqueville, Democracy in America, 282.

We recognize to the full the doctrine declared in *Missouri v. Lewis* (1879), 101 U. S. 22, 25 L. Ed. 989, with reference to the extent of the authority to classify; but for the very reason that the amendment was designed to protect persons against the exercise of arbitrary and capricious power by any of the departments of state government, a legislature can not enact a law which creates burdensome and invidious distinctions among persons who are subject to the jurisdiction of the state. The lines on which an enactment is built should have some relevancy to the subject-matter. "Arbitrary selection can never be justified by calling it classification." *Gulf, etc., R. Co. v. Ellis, supra; Cotting v. Kansas City Stock Yards Co.* (1901), 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; *Connolly v. Union Sewer Pipe Co.* (1902), 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679.

It is with these preliminary considerations that we take up the discussion of the effect of the enactment in controversy. An examination of section one reveals the fact that it was the legislative purpose to provide a remedy for only two

classes of creditors, namely, those who have in good faith
given the merchant credit for merchandise sold to him, and
persons who have loaned money to him; it being required
that the merchandise or money should be for use in con-
ducting the business, and that it should have been actually
used for that purpose. It is also made manifest, by the
latter part of the section, that it was the purpose to subject
the stock remaining in the hands of the vendee to the pay-
ment of said two classes of creditors, and, for the same pur-
pose, to render the vendee liable to them for the proceeds
of intermediate sales. Considering the provision of the sec-
tion that the sale shall be void as to such creditors, and the
further provision that the merchandise shall be liable to
them, and indulging the undoubted presumption that it was
not intended that the vendee should be twice liable for the
proceeds of intervening sales—once to such creditors, "to
the extent of the value of the merchandise" disposed of by
him, and once to general creditors who might in certain
circumstances hold him liable—it is evident that one of the
purposes of the enactment was, in practical effect, to cut
off the right of general creditors to avoid the conveyance as
actually fraudulent. But this consideration might be
passed over, and the case disposed of on another ground, if,
in the attempt to grant a remedy to set aside the conveyance
although fraud did not exist in fact, the enactment is
vicious in respect to the classification of creditors.

Counsel for appellee attempt to defend the classification
by the claim that there is an essential unity about a busi-
ness, and that it is within the range of the legislative dis-
cretion to determine that those who have contributed to
build it up, by extending to it credit, shall alone be entitled
to subject the stock to the payment of their debts; and, as
a part of the contention suggested, appellee's counsel state
that the act can be upheld on the same principle on which
material men's liens and certain other statutory liens are
allowed. The act in question does not proceed on the theory

of confusion of goods.    On the contrary, its terms are so general with reference to the rights attempted to be granted that it is immaterial whether any stock remains at the time of the sale that can be identified as having been unpaid for. So far as the act is concerned, it makes no difference for what length of time the debt of a favored creditor has remained unpaid.    After merchandise sold or money loaned has not only passed into the *corpus* of the debtor's estate, but can no longer be traced, what natural equity has a person who sold the goods or made the loan to a preference as against general creditors?    It is to be recollected that money or goods obtained by a merchant ordinarily becomes in a short time indistinguishable, and that such an asset is not a constant quantity, since it is subject to all the mutations of the business.

In all ordinary cases the proceeds of a particular sale finds its way into the merchant's cash drawer, and is ultimately deposited to the credit of his general bank account— an account which is checked against for the payment of his business obligations, and also to pay for multifarious outside needs.    In many instances it would no more be possible to trace the benefit conferred by the credit, and determine how much of it was continued in the business and how much of it was dissipated in the business or was otherwise expended, or to determine whether it was the proceeds of that credit (perhaps remotely given), or was the business energy of the merchant or of his employes, transmuted into money, which had on a particular day produced a favorable balance in his bank account, than it would be to separate the waters of two rivulets at a point below their confluence. In fact, it is evident that a benefit conferred upon a merchant by extending him a credit will ordinarily and in a short time become, with the other influences, direct and indirect, which have contributed to build up the business, so profoundly ingrained with his own property that it is scarcely a figure of speech to say that the union is chemical.

Why then should the classes of creditors described in the statute have an equity to take all, as against the various employes engaged in transacting the business, as against the owner of the building so used, or even as against those who have supplied the creature needs of the merchant and his family while he was engaged in the prosecution of the business? Suppose that, in point of fact, the amount realized by a merchant on a sale of goods purchased by him on credit could be shown to have been used by him in the purchase of groceries for his family, and that during some other portion of the time of his business endeavor he had incurred a debt in supplying his family with necessary groceries; can any reason be suggested why, as to the stock on hand at the time of a sale in bulk, the wholesaler should be entitled to his pay in full as against the grocer, when neither of them had contributed to the stock as it was at the time of the failure? In considering the demand of favored creditors that they be permitted to appropriate all of the stock, the fact must not be forgotten that in all ordinary cases the merchant has contributed to the business from his general estate, and that other persons are often his creditors for money loaned by them which was used in the business, although such lenders are not such as are described in the statute. But it is unnecessary to particularize further. It seems to us that it must be apparent that, after the point is fairly passed where the proceeds of goods sold or of money loaned can be directly traced, there is no estimating the force of the currents within and without the business, which have directly or indirectly contributed to build up the stock. Such a case is comparable to the fall of darkness, when all objects are indistinguishable.

We perceive no resemblance between such a right as the act in question attempts to confer and the lien given by statute to a material man. The latter right is in the nature of a *jus in re;* it is based on what is a fair assumption that the property is benefited to the extent of the materials be-

stowed upon it, that the property is a unit, that it is not expedient that the materials should be removed, and, lastly, the notice of record is a warning to all the world that may in principle be likened to the possession of a bailee.

Although general liens bear some resemblance to the rights attempted to be granted by the statute in question, yet the difference is vital, and such liens, which are only rights of detention, find their justification largely in their ancient character and in usage, which implies a tacit agreement between the parties. It was laid down by Lord Ellenborough, in *Rushforth* v. *Hadfield* (1806), 7 East 224, that attempts to enforce general liens beyond settled usages are not to be encouraged, since to establish a new right of that character would be to encroach upon the common law. Of course, the grant of legislative power implies a right to change the common law, particularly with reference to administrative and remedial processes, and a large, and in many respects uncontrollable, discretion exists in the legislative department to determine what is expedient; but, in determining what constitutes due process of law and equality before the law, proper consideration must be given to the ancient landmarks which were established for the protection of private right. Cooley, Const. Lim. (7th ed.), 505; *Maxwell* v. *Dow* (1900), 176 U. S. 581, 20 Sup. Ct. 448, 44 L. Ed. 597; *Hurtado* v. *California* (1884), 110 U. S. 516, 4 Sup. Ct. 292, 28 L. Ed. 232.

In its last analysis, the act is objectionable in that its classification as to the remedy of an action is too narrow, and in that it attempts, in effect, at least, to give the members of the favored class a preference on execution. The doctrine has been sanctioned by the Supreme Court of the United States that "every partial or private law which directly proposes to destroy or affect individual rights, or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void." *Cotting* v. *Kansas City Stock Yards Co.* (1901), 183 U. S. 79, 22

Sup. Ct. 30, 46 L. Ed. 92. See, also, Cooley, Const. Lim. (7th ed.), 559. As to the feature of the enactment which subjects the stock to the full payment of the debts of the preferred classes of creditors, it must be said that the enactment is in derogation of the fundamental right of equality before the law. It was said by Marshall, C. J., in *United States* v. *Nourse* (1835), 9 Pet. 8, 27, 9 L. Ed. 31: "An execution is the end of the law. It gives the successful party the fruits of his judgment." We have reasoned in vain, if it does not yet appear that this statute, calculated as it is unwarrantably to deny to creditors the ancient common law right to collect their debts by process of execution; thus forbidding to them the authority to reclaim their own, unnecessarily hampering their movements within the social organism, and making of them a proscribed class, large though it may be, is unconstitutional and void. If there is one occasion more than another which calls upon a court to vindicate the fundamental law, it is upon the complaint of a suitor who shows that there has been an attempt by hostile and discriminative legislation to bar his right to the ultimate process of the court, for such enactments strike at the very root of justice.

There is, and always will be, in every representative government, a struggle going on between the various interests of society with reference to legislation. This but evinces the necessity for the existence of a coördinate department of government, also acting under the responsibility of an oath, to determine, when called on to enforce legislation, whether it operates unequally. Hamilton declared that, "it is of great importance in a republic, not only to guard the society against the oppression of its rulers; but to guard one part of the society against the injustice of the other part. * * * Justice is the end of government. It is the end of civil society. It ever has been, and ever will be, pursued, until it be obtained, or until liberty be lost in the pursuit." 51 Federalist.

In concluding this opinion, we are impressed with the fact that the following language, used by Mr. Justice Cooley in deciding the case of *People, ex rel.,* v. *Township Board* (1870), 20 Mich. 452, 486, 4 Am. Rep. 400, is most apposite: "But the discrimination by the state between different classes of occupations, and the favoring of one at the expense of the rest, whether that one be farming or banking, merchandising or milling, printing or railroading, is not legitimate legislation, and is an invasion of that equality of right and privilege which is a maxim in state government. When the door is once opened to it, there is no line at which we can stop and say with confidence that thus far we may go with safety and propriety, but no further. Every honest employment is honorable; it is beneficial to the public; it deserves encouragement. The more successful we can make it, the more does it generally subserve the public good. But it is not the business of the state to make discriminations in favor of one class against another, or in favor of one employment against another. The state can have no favorites. Its business is to protect the industry of all, and to give all the benefit of equal laws."

Judgment reversed, with a direction to sustain appellant's demurrer to each paragraph of the complaint.