Argued April 18, affirmed July 1, 1919.

## HARTWIG *v.* RUSHING.*

(182 Pac. 177.)

**Fraudulent Conveyances—Bulk Sales Law—Applicability—Consideration—"Sale."**

1. Construed as a whole, bulk sales law (Sections 6069–6072, L. O. L.), applies, not only to sales for money, but also to sales for property measured in money; "sale or transfer" being spoken of, and direction being given for acts "before paying or delivering * * any part of the purchase price or consideration."

---

*Authorities passing on the question of remedy of creditors where sale is made in violation of bulk sales law, are collated in notes in 39 L. R. A. (N. S.) 374; L. R. A. 1916B, 974.

On notice to creditors under bulk sales law, see note in L. R. A. 1917F, 230.                                              REPORTER.

Exchange of Property—"Barter."

2. A "barter" or "exchange of properties" occurs where one article is exchanged for another; no price in money being fixed upon either.

Words and Phrases—"Cash."

3. Ordinarily, the word "cash" means money, but it is frequently used as a term meaning the opposite of credit.

Fraudulent Conveyances—Bulk Sales Law.

4. Bulk sales law (Sections 6069–6072, L. O. L.) is not limited to protection of mercantile creditors only; it speaking of "all of the creditors," "all of his creditors," and "any and all creditors."

Fraudulent Conveyances—Bulk Sales Law—Creditors Entitled to Notice.

5. Bulk sales law (Sections 6069–6072, L. O. L.) requires notice to creditors whose demands are not yet due; statement required of seller being of all creditors, with amount of indebtedness due or owing, or to become due or owing.

Fraudulent Conveyances—Bulk Sales Law—Remedy of Creditors—Purchaser from Grantee.

6. A sale without compliance with bulk sales law being by provision of Section 6070, L. O. L., conclusively presumed fraudulent and void, a trust in favor of creditors of the seller, he being without assets and they having reduced their claim to judgment, entitling them to equitable remedy, will be impressed on land obtained by the buyer of the stock of goods in exchange therefor, and then conveyed to others without consideration.

[As for remedies of creditors for violation of bulk sales law, see note in Ann. Cas. 1916C, 928.]

From Multnomah: ROBERT TUCKER, Judge.

Department 1.

The plaintiff William H. Hartwig is endeavoring to impress a trust upon certain lands so that he can collect a money judgment which he obtained against George Hartwig, who sold a hardware store and stock of goods to C. C. Rushing without complying with the bulk sales law. William H. Hartwig and George Hartwig are brothers; the former was a resident of Iowa, while the latter lived in Oregon. George Hartwig informed his brother that he wished to purchase a hardware store owned by Frank L. Miller in Aurora, Oregon. George Hartwig had $4,000 in cash and a

tract of timber land in Idaho, but he needed more money to consummate the purchase. For the purpose of enabling George Hartwig to buy the store the two Hartwigs borrowed $5,500 from the City National Bank of Tipton, Iowa, on February 19, 1910, and gave their promissory note to the bank for that amount payable one year after that date. In February, 1910, George Hartwig bought the store from Miller for $15,700. Miller received in payment for the store the $5,500 which had been borrowed from the Iowa bank, $3,300 of the $4,000 which George Hartwig already had, the Idaho timber land at $3,500 and a note for the balance of the purchase price.

William H. Hartwig paid the note which he and his brother had given to the Iowa bank; and for the purpose of evidencing the resulting indebtedness George Hartwig gave his note to William H. Hartwig for $5,500, payable, with interest, five years after February 18, 1911, its date.

George Hartwig took possession of the store and continued to operate it until September 11, 1911, when he transferred it to C. C. Rushing. There is in evidence a writing which reads as follows:

"Aurora, Oregon, Aug. 28th, 1911.

"This agreement entered into the above day by & between Geo. Hartwig, of Aurora, Ore., party of the first part & C. C. Rushing of Portland, Ore., party of the second part, Witnesseth:—Said first party has sold his stock of goods in Aurora to said second party & has taken as payment for said stock of goods a 31 acre prune ranch near Vancouver, Wash., at $31,000.

"Said first party is to take invoice of said stock of goods one day this week at invoice cost for all first class goods & others put in at value & the first party is to pay same as part payment on the prune ranch less an amt. owed for goods to become due amtg. to

between $2500 & $4000, to be ascertained by the second part. The balance due on the prune ranch is to be paid by mortgage on same due in two, three & four yrs. 7% int., payable semiannually. The first party assumes $4,000 now against said prune ranch, due in 1 & 2 yrs.

"Witness our hands the day & year first above written.

"GEO. HARTWIG.
"C. C. RUSHING."

The stock of goods was invoiced by George Hartwig and Rushing with the assistance of some representatives of certain wholesalers who were creditors of Hartwig. The parties are not agreed as to the total invoice price of the stock of goods sold to Rushing; the figures were between $13,000 and $18,500. George Hartwig claims that the stock of hardware invoiced $16,820 and with 10 per cent added for freight amounted to $18,500. The uncontradicted evidence of George Hartwig is that he and Rushing agreed upon $300 as the price of the fixtures and furniture. It is conceded that George Hartwig gave a mortgage to C. C. Rushing for $17,274.54 on the 31 acre prune orchard; and hence this fact considered in connection with the writing dated August 28, 1911, would indicate that the stock of goods, including the fixtures and furniture valued at $300, was invoiced at $13,725.46. Soon after the store was transferred to Rushing he paid a total of $4,367.34 to certain wholesalers for goods which they had sold to Hartwig. After selling the store Hartwig collected about $1,500 on book accounts due him and used the collections in making payments to some of his creditors.

Rushing carried on the hardware business until October 23, 1911, when he transferred the store to

George and Lena Ehlen in exchange for about 79 acres of land in Marion County. Afterwards on November 28, 1911, C. C. Rushing deeded the Marion County land to Annie L. Kent in exchange for three lots in the First Addition to Cherrydale in Portland and certain personal property "known as the furnishings of the Almira Apartments." The conveyance of the Cherrydale lots was made to "J. G. Rushing."

C. C. Rushing died on January 6, 1912, and on January 27th, following, his widow Johnie Gertrude Rushing was appointed administratrix of his estate; and she was also appointed the guardian of the estate and person of the six year old daughter Maxine C. Rushing. On October 8, 1912, Johnie Gertrude Rushing, as administratrix, traded the "furnishings of the Almira Apartments" for a lot in Overlook Addition in Portland and took a deed in the name of John C. Shillock as trustee of the C. C. Rushing estate; and subsequently on June 14, 1916, the trustee conveyed the Overlook lot to Maxine C. Rushing pursuant to an order made by the County Court in the settlement of the C. C. Rushing estate.

The 31 acre orchard was conveyed to George Hartwig, subject to a mortgage of $4,000 held by George W. Seward; and Hartwig then gave a second mortgage to C. C. Rushing for $17,274.54 to cover the difference between the value of the hardware store and $31,000 the agreed value of the prune orchard. The Seward mortgage which was assumed by Hartwig was offset by George Hartwig's indebtedness to wholesalers whom Rushing agreed to pay. The Seward mortgage was foreclosed in 1913 and the prune orchard was acquired through foreclosure proceedings by O. W. Olson, as trustee for Johnie Gertrude Rushing, who

furnished the necessary funds out of life insurance paid to her on account of the death of her husband.

It is not necessary to determine whether George Hartwig was mentally incapacitated to transact business when he sold the store; but it is sufficient to say that the evidence shows clearly that he was not in good physical or mental health.

George Hartwig claims that C. C. Rushing knew about the former's indebtedness to his brother and that Rushing agreed to pay William H. Hartwig; and in this connection we quote as follows from the testimony of George Hartwig.

"Why, I agreed with him that I would not let my brother know; wait a little while until he could get the cash to pay that note; that the note wasn't due yet. It ran for five years."

George Hartwig insisted that C. C. Rushing agreed to pay the note which the former had given to William H. Hartwig; but the writing signed by C. C. Rushing and George Hartwig contradicts the contention made by the latter.

It is true that George Hartwig explains that the writing was not signed until after he had completed the sale to Rushing and that he attached his signature to some writing without reading it and for the purpose of accommodating Rushing. However, the admitted fact of the amount of the mortgage given by Hartwig on the prune orchard taken together with other evidence in the record points to the conclusion that Rushing did not agree to pay the note held by William H. Hartwig.

The uncontradicted evidence is that William H. Hartwig did not learn of the sale of the hardware store to Rushing until 1915 and that upon learning of

the sale he came from Iowa to Oregon in July, 1915, and placed the matter in the hands of attorneys. On May 16, 1916, William H. Hartwig obtained a judgment on the promissory note against George Hartwig for $7,626.52 in the Circuit Court of Multnomah County; and on the following day, May 17, 1916, William H. Hartwig commenced this suit against George Hartwig, Johnie Gertrude Rushing, as an individual and as administratrix of the estate of C. C. Rushing, deceased, and against Maxine C. Rushing, praying in his complaint that the court decree that Johnie Gertrude Rushing holds the Cherrydale lots and that Maxine C. Rushing holds the Overlook lot "merely in trust" on account of being the proceeds derived from the sale of the hardware store without first complying with the bulk sales law. There was a decree in accordance with the prayer of the complaint; and all the defendants, except George Hartwig, appealed.

AFFIRMED.

For appellants there was a brief over the names of *Mr. Jay Bowerman* and *Messrs. Emmons & Webster,* with an oral argument by *Mr. Bowerman.*

For respondent there was a brief with oral arguments by *Mr. Loyal H. McCarthy* and *Mr. J. Le Roy Smith.*

HARRIS, J.—When Rushing bought the store with its stock of hardware he did not receive or demand from the seller a written statement under oath, containing the names and addresses of the creditors, or a statement showing the indebtedness due or to become due from the seller. Some of the merchant creditors had actual notice and assisted in invoicing the stock of

goods; and it may fairly be inferred that nearly all, if not all, the merchant creditors acquired a knowledge of what Rushing and Hartwig were doing before the invoice was completed and the stock transferred to Rushing.

It is proper to note also that after Rushing paid $4,367.34 to the merchant creditors of George Hartwig and after the latter turned over to his creditors the $1,500 collected by him, his remaining indebtedness consisted of the Miller note, the note to his brother, and only three or four hundred dollars presumably due merchant creditors.

It is not necessary to enumerate in detail all the obstacles which contributed towards delaying the commencement of this suit, but it is enough to say that we approve the finding of the trial court that the plaintiff "has acted promptly."

George Hartwig is insolvent and has no money or other property.

Johnie Gertrude Rushing knew as early as the latter part of August, 1911, that her husband "was expecting or was thinking of making the deal with Mr. George Hartwig." When asked "In the business transactions of your husband that he had not only with this man but with others, were they talked over between you, these business affairs?" she answered, "Very thoroughly Mr. Rushing went through them." She stated also that her husband was "very confidential with" her "in reference to his business affairs," and that she was "at Aurora and was around the store a great deal when the inventory was being taken."

It was contended throughout the trial that Johnie Gertrude Rushing loaned $5,000 to her husband before he came to Oregon and that the Cherrydale lots were

conveyed to her in satisfaction of that indebtedness. A careful reading of the whole record convinces us, however, that the trial judge who saw and heard the witnesses, correctly found that "no consideration was paid for" the Cherrydale lots by Johnie Gertrude Rushing or for the Overlook lot by Maxine C. Rushing "and that the conveyances to them were voluntary conveyances" and that Johnie Gertrude Rushing had full knowledge of all the facts surrounding the purchase of the Hartwig store.

The bulk sales law, as originally enacted in 1899, consisted of four sections and was a counterpart of a number of the bulk sales statutes which at about that time were passed by the legislatures of many of the states. Our statute was amended in 1901 and in 1905 and, as amended, was carried into the Code as Sections 6069 to 6072, L. O. L., inclusive. The act was again amended by Chapter 281, Laws of 1913; but in 1911, when George Hartwig sold the hardware store to C. C. Rushing, Sections 6069 and 6070, L. O. L., which are especially pertinent here, read as follows:

"Section 6069. It shall be the duty of every person who shall bargain for or purchase any stock of goods, wares, or merchandise in bulk, for cash or on credit, to demand and receive from the vendor thereof, and if the vendor be a corporation then from a managing officer or agent thereof, at least five days before the consummation of such bargain or purchase, and at least five days before paying or delivering to the vendor any part of the purchase price or consideration therefor, or any promissory note or other evidence of indebtedness therefor, a written statement under oath containing the names and addresses of all of the creditors of said vendor, together with the amount of indebtedness due or owing, or to become due or owing, by said vendor to each of such creditors,

and if there be no such creditors, a written statement under oath to that effect; and it shall be the duty of such vendor to furnish such statement at least five days before any sale or transfer by him of any stock of goods, wares, or merchandise in bulk.

"Section 6070. After having received from the vendor the written statement under oath mentioned in Section 6069 the vendee shall, at least five days before the consummation of such bargain or purchase, and at least five days before paying or delivering to the vendor any part of the purchase price or consideration therefor, or any promissory note or other evidence of indebtedness for the same, in good faith notify or cause to be notified, personally or by wire or by registered letter, each of the creditors of the vendor named in said statement, of the proposed purchase by him of such stock of goods, wares, or merchandise; and whenever any person shall purchase any stock of goods, wares, or merchandise in bulk, or shall pay the purchase price or any part thereof, or execute or deliver to the vendor thereof or to his order, or to any person for his use, any promissory note or other evidence of indebtedness for said stock, or any part thereof, without having first demanded and received from his vendor the statement under oath as provided in Section 6069, and without having also notified or caused to be notified all of the creditors of the vendor named in such statement, as in this section prescribed, such purchase, sale, or transfer shall, as to any and all creditors of the vendor, be conclusively presumed fraudulent and void."

1. It is contended that the statute only applies to a "sale" as distinguished from a "barter or exchange" of personal property and that the bulk sales law applies only to transfers "for cash or on credit"; that the transfer of the store to Rushing was not a sale "for cash or on credit"; and that therefore the transaction was not in violation of the bulk sales law.

2. In legal nomenclature the term "sale" is used in a restricted and also in a broad sense. The controversy presented by this appeal does not require an attempt to determine whether the word "sale" when technically and exactly defined is confined to the restricted sense or comprehends the broad meaning. When employed in its restricted sense it means a transfer of title for money: *Huthmacher* v. *Harris' Admrs.,* 38 Pa. St. 491 (80 Am. Dec. 502). There are numerous transactions where the word "sale" must, because of the very nature of the business, be given its restricted meaning, as, for example, powers of attorney and the like: *Coulter* v. *Portland Trust Co.,* 20 Or. 469, 481 (26 Pac. 565, 27 Pac. 266); *Colgan* v. *Farmers & Mechanics' Bank,* 59 Or. 469, 480 (106 Pac. 1134, 114 Pac. 460, 117 Pac. 807); *Mora* v. *Murphy,* 83 Cal. 12 (23 Pac. 63). When used in its broad sense the term "sale" includes the transfer of personal property for a consideration estimated in money. There are many authorities which define a sale of personal property as the transfer of a chattel from the seller to the buyer for a price, or a consideration estimated in money; and consequently under that definition if property is taken at a fixed money price, the transfer is a sale whether the fixed money price is paid in cash or in goods. A barter or exchange of properties occurs where one article is exchanged for another, no price in money being fixed upon either: 35 Cyc. 25, 40; 17 Cyc. 830; 1 Mechem on Sales, §§ 1 and 13; 23 R. C. L. 1185, 1186; *Picard* v. *McCormick,* 11 Mich. 68; *Huff* v. *Hall,* 56 Mich. 456 (23 N. W. 88); *Fuller* v. *Duren,* 36 Ala. 73 (76 Am. Dec. 318); *Thornton* v. *Moody* (Tex. Civ. App.), (24 S. W. 331); *Jordon* v. *Dyer,* 34 Vt. 104 (80 Am. Dec. 668); *Loomis* v. *Wainwright,* 21 Vt. 520;

*Borland* v. *Nevada Bank,* 99 Cal. 89 (33 Pac. 737, 37 Am. St. Rep. 32).

The word "sale" is sometimes used in what may be termed its popular sense, and when so used signifies the transfer of property from one person to another for a consideration of value, without reference to the particular mode in which the consideration is paid; and as stated in *Gallus* v. *Elmer,* 193 Mass. 106, 109 (78 N. E. 772, 8 Ann. Cas. 1067), in the interpretation of statutes the word "sale" is often given its popular signification and "held to include barter and any transfer of personal property for a valuable consideration": *Howard* v. *Harris,* 8 Allen (Mass.), 297; *James* v. *State,* 124 Ga. 72 (52 S. E. 295); *Howell* v. *State,* 124 Ga. 698 (52 S. E. 649); *Commonwealth* v. *Clark,* 14 Gray (Mass.), 367, 372. See Webster's Dictionary.

3. Ordinarily the word "cash" means money and yet it has been held that "in sales" it "is frequently used as a term meaning the opposite of credit": *Lee* v. *Cutrer,* 96 Miss. 355, 366 (51 South. 808, Ann. Cas. 1912B, 478, 27 L. R. A. (N. S.) 315).

When examining this statute we must read it in its entirety and construe the words found in it in the light of the manifest intent of the legislature; and when all the language of the act is so read and considered it becomes plain that the lawmakers did not intend that the statute should be limited to a "sale" for "cash or on credit." The enactment opens by declaring that it shall be the duty of every person who shall "bargain for or purchase." The words "bargain for or purchase," and especially the word "purchase," are terms of broad signification. If the statute contained no other words than "for cash or on credit," then that

93 Or. —2

language would probably limit what precedes it and it would quite likely be necessary to hold that the act applied only to a "bargain" or "purchase" made "for cash or on credit"; but the statute does contain other words, some of which are coextensive in meaning with the words "sale" and "cash" while others are more comprehensive. In Section 6069 we read that the purchaser must demand and receive a written statement "before paying or delivering to the vendor *any part of the* purchase price or *consideration therefor,* or any promissory note or other evidence of indebtedness therefor." The same language, last quoted, appears a second time in Section 6070. It will be observed that the disjunctive conjunction "or" is employed; that not only the word "paying" but also the word "delivering" is used; and that in addition to the words "purchase price" the word "consideration" is employed. It is true that the language which has been quoted from Sections 6069 and 6070 is stated a third time in Section 6070 and in the third statement of it the word "consideration" is omitted. The words "purchase price," however, appear in each of the three statements and those words, if they stood alone, would be sufficient to include sales for the equivalent of money as well as sales for money: 31 Cyc. 1171; 32 Cyc. 1264; and when to the words "purchase price" is added the word "consideration," and these words are always stated disjunctively, it becomes apparent that the legislative mind intended the statute to apply not only to transactions involving the "paying" of "money" or the "delivering" of notes or other evidence of indebtedness but also to the "delivering" of such "consideration" as is the equivalent of money. This conclusion is further supported by other language

found in three of the four sections of the enactment; for nowhere in the enactment is the word "sale" found alone, but in every instance it appears in company with the word "transfer" and the two words are invariably stated in the alternative because the language is always thus: "Sale or transfer." Moreover, in Section 6072, L. O. L., we read: "Sold or conveyed." While there is judicial authority for holding that the language of the statute is sufficiently appropriate to include a pure barter, still we prefer to postpone the decision of that question until a case is presented requiring an adjudication of that question. However, we have no hesitancy in declaring that the statute applies not only to sales for money but also to sales for property measured in money or, in the words of the books, for the equivalent of money or money's worth. The stock of goods was invoiced at a fixed price in money; the furniture was measured in terms of money; and the prune orchard was valued in dollars. A price in money was placed upon every article of property involved in the transaction; and hence the bulk sales law applied to the transfer of the stock of hardware.

4. It is next argued that the bulk sales law protects none but mercantile creditors. Sections 6069 and 6070 speak of "all of the creditors"; Section 6071 refers to "all of his creditors"; and Section 6070 emphasizes the requirements of the statute by declaring that a "purchase, sale, or transfer" made without compliance with the act shall be conclusively presumed fraudulent and void as to "any and all creditors." These words, to which attention has been directed, are plain, unequivocal and unambiguous. They construe themselves. They comprehend all creditors. No distinction is made between classes of creditors: *Galbraith* v.

*Oklahoma State Bank,* 36 Okl. 807 (130 Pac. 541);
*People's Savings Bank* v. *Van Allsburg,* 165 Mich. 524
(131 N. W. 101); *Eklund* v. *Hopkins,* 36 Wash. 179 (78
Pac. 787); *Joplin Supply Co.* v. *Smith,* 182 Mo. 212
(167 S. W. 649, 654). Indeed, in one jurisdiction it
has been held that a statute is unconstitutional if it
attempts to protect mercantile creditors only: *McKin-
ster* v. *Sager,* 163 Ind. 671 (72 N. E. 854, 106 Am. St.
Rep. 268, 68 L. R. A. 273).

5. The appellants argue that William H. Hartwig
was not entitled to notice, for the reason that the note
did not become due until five years after date. This
argument is completely answered by the plainest kind
of language appearing in the statute itself; for it is
said in Section 6069, L. O. L., that the written state-
ment must show the amount of the indebtedness due or
owing, or "to become due or owing." The statute is
in favor of all creditors and includes those whose de-
mands are not yet due as well as those whose demands
are overdue: *Hillsboro National Bank* v. *Garbarino,* 82
Or. 405, 411 (161 Pac. 703); *Calkins* v. *Howard,* 2 Cal.
App. 233 (83 Pac. 280); 12 R. C. L. 492.

6. The appellants insist with much vigor that the
plaintiff is not entitled to the relief sought by him,
even though it be decided that he was a creditor within
the meaning of the statute. Section 6070, L. O. L.,
provides that any "purchase, sale, or transfer" made
without observing the requirements of the bulk sales
law shall, as to any and all creditors of the seller, "be
conclusively presumed fraudulent and void." Fail-
ure to comply with the statute results in a conclusive
presumption of fraud; and the effect of this conclusive
presumption is not only to relieve the creditor from
the necessity of proving actual fraud but also to pre-
clude the buyer from gainsaying the presumption:

*Goodwin* v. *Tuttle,* 70 Or. 424, 432 (141 Pac. 1120);
*Galbraith* v. *Oklahoma State Bank,* 36 Okl. 807 (130
Pac. 541); *Calkins* v. *Howard,* 2 Cal. App. 233 (83 Pac.
280); *Joplin Supply Co.* v. *Smith,* 182 Mo. App. 212
(167 S. W. 649, 654); *Glantz* v. *Gardiner,* 40 R. I. 297
(100 Atl. 913, L. R. A. 1917F, 226, 228). When a
transfer of property is fraudulent as to the creditors
of the seller certain remedies are available to the cred-
itors and those remedies are made available because
of the fraud. If fraud is the element which deter-
mines the right of the creditor to a remedy then on
principle the same remedy which would afford relief
against actual or common-law fraud should be equally
available for relief against conclusively presumed or
statutory fraud. It is true that moral turpitude is
present in one instance and is absent in the other and
yet fraud is present in each instance; and it is the pres-
ence of this fraud that confers the right to relief and,
as was said in *Rothchild Bros.* v. *Trewella,* 36 Wash.
679 (79 Pac. 480, 104 Am. St. Rep. 973, 68 L. R. A.
281).

"We can discover no logical distinction between the
different classes of conveyances which the common
and statutory laws declare fraudulent. The remedy
afforded an injured creditor must, upon principle, be
the same in all cases, unless the legislature has pro-
vided a different remedy."

If a transfer is fraudulent it makes no difference
whether it is common law or statutory fraud; for in
either event the general rule is that the creditor who
has not reduced his claim to a judgment against the
seller and debtor or has not obtained a lien cannot sue
the purchaser directly, as on a personal liability: *Roth-
child Bros.* v. *Trewella,* 36 Wash. 679 (79 Pac. 480, 104
Am. St. Rep. 973, 68 L. R. A. 281); *Morton* v. *Denham,*

39 Or. 227, 240 (64 Pac. 384); *Rogers' Milling Co.* v. *Goff etc. Co.,* 46 Okl. 339 (148 Pac. 1029); *Bewley* v. *Sims* (Tex. Civ. App.), (145 S. W. 1076); *Goodwin* v. *Tuttle,* 70 Or. 424, 430 (141 Pac. 1120); *Joplin Supply Co.* v. *Smith,* 182 Mo. App. 212 (167 S. W. 649, 654); 12 R. C. L. 645. However, *Daly* v. *Sumpter Drug Co.,* 127 Tenn. 412 (153 S. W. 167, Ann. Cas. 1914B, 1101), seem's to furnish authority for an exception to this general rule if the purchaser has disposed of the goods or so intermingled them with other property as to render them indistinguishable.

If the fraudulent grantee still has in his possession the identical property which was transferred from the debtor, not much difficulty is encountered by the creditor; for he may if he wishes sue the debtor and attach the stock of goods in the hands of the fraudulent purchaser on the theory that as between the purchaser and the creditor the property still belongs to the debtor: *Bank of Colfax* v. *Richardson,* 34 Or. 518, 540 (54 Pac. 359, 75 Am. St. Rep. 664); 20 Cyc. 656, 661. This rule finds frequent illustration not only in cases of common-law fraud but also in cases of statutory fraud resulting from a failure to observe bulk sales laws: *Oregon Mill & Grain Co.* v. *Hyde,* 87 Or. 163, 170 (169 Pac. 791); *Owosso Carriage & Sleigh Co.* v. *McIntosh & Warren,* 107 Tex. 307 (179 S. W. 257, L. R. A. 1916B, 970); *Jaques & Tinsley Co.* v. *Carstarphen Co.,* 131 Ga. 1 (62 S. E. 82); *Moultrie Grocery Co.* v. *Holmes-Hartsfield Co.* (Ga. App.), (96 S. E. 346); *Coffey* v. *McGahey,* 181 Mich. 226 (148 N. W. 356, Ann. Cas. 1916C, 923). In many jurisdictions a common-law fraudulent transferee may be held to the liability of a garnishee or trustee on account of the property so conveyed, or the proceeds if he has disposed of the same: 20 Cyc. 663; *Sabin* v. *Michell,* 27 Or. 66 (39

Pac. 635). Difficulties at once arise, however, when it is ascertained that the fraudulent grantee has disposed of the property which was transferred from the debtor. Although in cases of common-law fraud a creditor who has reduced his claim to judgment usually can avail himself of some sort of remedy, the adjudications do not entirely agree upon the procedure to be followed by the creditor: 12 R. C. L. 646; 20 Cyc. 262.

As between the creditor and the purchaser the transfer of a stock of goods in bulk is fraudulent and void; the goods are treated as the property of the debtor; and therefore the goods are regarded as a trust fund in the hands of the purchaser and he is viewed as a trustee for the benefit of the creditors. If the purchaser disposes of that trust fund, then it is entirely logical to say that he holds the proceeds as a trust fund and that the creditors may reach those proceeds to the same extent that they could have reached the fund before a change in its form was effected. The following authorities give support to this rule: *Fitz Henry* v. *Munter,* 33 Wash. 629, 634 (74 Pac. 1003); *Kohn* v. *Fishback,* 36 Wash. 69 (78 Pac. 199, 104 Am. St. Rep. 941, L. R. A. 1917F, 234); *In re Gaskill* (D. C.), 130 Fed. 235, 236; *In re Connor* (D. C.), 146 Fed. 998; *Jaques & Tinsley Co.* v. *Carstarphen Co.,* 131 Ga. 1 (62 S. E. 82); *Moultrie Grocery Co.* v. *Holmes-Hartsfield Co.* (Ga. App.) (96 S. E. 346); *Coffey* v. *McGahey,* 181 Mich. 225 (148 N. W. 356, Ann. Cas. 1916C, 923, 925); *Flechheimer-Keiffer Co.* v. *Burton,* 128 Tenn. 682 (164 S. W. 1179, 51 L. R. A. (N. S.) 343, 345); *Oregon Mill & Grain Co.* v. *Hyde,* 87 Or. 163, 170 (169 Pac. 791).

William H. Hartwig reduced his claim to a judgment before he began this suit and that fact plus the fact

that George Hartwig is insolvent and utterly without assets entitled William H. Hartwig to avail himself of an equitable remedy: *Fleischner* v. *First Nat. Bank,* 36 Or. 553, 563 (54 Pac. 884, 60 Pac. 603, 61 Pac. 345); *Bowman* v. *Sherrill,* 59 Or. 603, 604 (117 Pac. 1122).

Johnie Gertrude Rushing took title to the three lots in Cherrydale Addition with knowledge of the circumstances surrounding the transfer of the hardware store; the conveyance to Johnie Gertrude Rushing and the transfer to the daughter Maxine C. Rushing were voluntary conveyances without consideration; and, therefore, each of those grantees stands in the shoes of C. C. Rushing: *Porter* v. *O'Donovan,* 65 Or. 1, 10 (130 Pac. 393); 20 Cyc. 627; 646, 650.

The three lots in Cherrydale Addition and the one lot in Overlook Addition are the equivalent of the hardware store. The stock of goods was transmuted into land consisting of the four lots. The record title to those lots was never in the name of C. C. Rushing although the paper title is now in the name of persons standing in the shoes of C. C. Rushing and in these circumstances the plaintiff was clearly entitled to resort to a suit in equity: 20 Cyc. 676; *Jimmerson* v. *Duncan,* 48 N. C. 537; *Wright* v. *Douglass,* 3 Barb. (N. Y.) 554; *Maynard* v. *Hoskins,* 9 Mich. 485; *Webster* v. *Folsom,* 58 Me. 230.

Additional problems would be presented for solution if the purchase price had been less than the total indebtedness of George Hartwig; but none of the questions which might arise out of that and kindred situations are involved here.

The decree appealed from is affirmed.

AFFIRMED.

McBRIDE, C. J., and Benson and Burnett, JJ., concur.