**HERDER et al. v. HELVERING, Com'r of Internal Revenue.**

**HERDER v. SAME.**

Nos. 7179, 7180.

Decided June 26, 1939.

United States Court of Appeals for the District of Columbia.

Writ of Certiorari Denied Dec. 4, 1939.

See 60 S.Ct. 262, 84 L.Ed. ——.

Camden R. McAtee, of Washington, D. C., for petitioners.

James W. Morris, Asst. Atty. Gen., and Sewall Key, Norman D. Keller and W. Croft Jennings, Assts. to Atty. Gen., for respondent.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

Two petitions for review of United States Board of Tax Appeals redeterminations of separate income tax liabilities are consolidated herein. The Board determined a deficiency against George Herder, deceased, for the period January 1 to March 29, 1934, the date of his death, (to which we will refer hereinafter as the first period) and a deficiency against his wife, Mary Herder, for the calendar year 1934.

▮ The decedent, George Herder, and his wife Mary Herder, resided in the State of Texas and owned community property located there which produced income during the first period. The applicable Texas statutes vest title to the community proper-

ty in the husband and wife in equal parts, but, during coverture, the husband has the exclusive power of control over the property as long as he discharges his obligation as the head of the family.[1] The income from the community is divided equally between them; each may make separate returns of one-half of the income, with an equal division of the allowable deductions.[2]

The questions presented for our consideration are:

1. The disallowance of certain claimed deductions for bad debts.

2. The proper classification of proceeds from an insurance policy.

3. The proper adjusted cost basis of the property destroyed by fire.

We will consider them in the order outlined.

### The Bad Debts

George Herder was in complete control of the community property. It is agreed, and so found by the Board, that, during his lifetime, he kept regular books of account for the community; that they were single entry books, kept on a cash receipts and disbursement basis; that, from time to time, bad debts were charged off by entering credits for the amounts thereof; that no reserve for bad debts was set up on the books; and, that the debts in question were never charged off on the books of account by George Herder in his life time.

▮ The bad debts involved originally aggregated $29,975.56. In the hearing before the Board, petitioners abandoned the claim for deduction of the debt of J. W. Gates amounting to $1,861.22 as it had been charged off by George Herder in a prior taxable period. The record shows, and the Board finds, that certain other claimed bad debts, aggregating $2,521.28 became worthless in a prior taxable period and were disallowed as deductions for this reason. We affirm the Board in this respect. Avery v. Com'r, 5 Cir., 22 F.2d 6, 55 A.L.R. 1277. Thus the bad debts we consider total $25,-593.06, of which one-half, or $12,796.53, is claimed to be a deductible item to George

[1] Vernon's Texas Civ.St.1936, Art. 4619, sec. 1; Stone v. Jackson, 109 Tex. 385, 210 S.W. 953; Martin v. McAllister, 94 Tex. 567, 63 S.W. 624, 56 L.R.A. 585; Shaw v. Shaw, Tex.Civ.App., 28 S.W.2d

173; Davis v. Davis, Tex.Civ.App., 186 S.W. 775.

[2] Hopkins v. Bacon, 282 U.S. 122, 51 S.Ct. 62, 75 L.Ed. 249; Stewart v. Com'r, 5 Cir., 95 F.2d 821; Johnson v. Com'r, 8 Cir., 88 F.2d 952.

Herder, deceased, in the first period, and an equal amount claimed to be deductible in the return of Mary Herder for the taxable year 1934. The return of the estate of George Herder, deceased, for the period March 30 to December 31, 1934, is not before us.

### The George Herder Return

The Board found that the debts became worthless upon the death of George Herder because of their peculiar nature and the discontinuance of the financing of the debtors due to his death.

Sec. 23 (k) of the Revenue Act of 1934 reads, in part, as follows:

"Sec. [§] 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

"* * *

"(k) Bad debts. Debts ascertained to be worthless and charged off within the taxable year * * *." 26 U.S.C.A. § 23(k).

█ Until his death George Herder was on a cash receipts and disbursement basis, and kept books of account. During prior years, from time to time, he charged off worthless debts by entries on the books. In such a case debts must not only be ascertained to be worthless within the taxable year, but they must be charged off within the taxable year.[3] The Board found that these essentials were not present in his case; that there was no charge off on the books, and that the debts did not become worthless within that taxable period.

Petitioners however maintain that the enactment of secs. 42 and 43 of the Revenue Act of 1934[4] eliminates the application of sec. 23 (k) herein; that it removed George Herder from his position as a taxpayer upon a cash receipts and disbursement basis, and placed him upon an accrual basis for the taxable period involved; and, that the books of account actually kept by him are not to be considered.

In considering the contention of petitioners we must consider the legislative history of secs. 42 and 43.

█ From its very terms, and as is clearly expressed in the reports of the congressional committees[5] handling the legislation, it is evident that sec. 42 found its way into the tax law for the purpose of pre-

---

[3] Fairless v. Com'r, 6 Cir., 67 F.2d 475; American Cigar Co. v. Com'r, 2 Cir., 66 F.2d 425, certiorari denied 290 U.S. 699, 54 S.Ct. 209, 78 L.Ed. 601; Continental Pipe Mfg. Co. v. Poe, 9 Cir., 59 F.2d 694; Cross v. Com'r, 9 Cir., 54 F.2d 781.

[4] "Sec. [§] 42. Period in which items of gross income included

"* * * In the case of the death of a taxpayer there shall be included in computing net income for the taxable period in which falls the date of his death, amounts accrued up to the date of his death if not otherwise properly includible in respect of such period or a prior period." 26 U.S.C.A. § 42.

"Sec. [§] 43. Period for which deductions and credits taken

"* * * In the case of the death of a taxpayer there shall be allowed as deductions and credits for the taxable period in which falls the date of his death, amounts accrued up to the date of his death if not otherwise properly allowable in respect of such period or a prior period." 26 U.S.C.A. § 43.

[5] H. Report, 704, 73rd Cong., 2nd Session, Ways and Means Committee, pg. 24: "Sections 42 and 43. Income accrued and accrued deductions of decedents: The courts have held that income accrued by a decedent on the cash basis prior to his death is not income to the estate, and under the present law, unless such income is taxable to the decedent, it escapes income tax altogether. By the same reasoning, expenses accrued prior to death cannot be deducted by the estate. Section 42 has been drawn to require the inclusion in the income of a decedent of all amounts accrued up to the date of his death regardless of the fact that he may have kept his books on a cash basis. Section 43 has also been changed so that expenses accrued prior to the death of the decedent may be deducted."

S. Report No. 558, 73rd Cong. 2nd Session, Committee on Finance, pg. 28: "Sections 42 and 43. Period for which deductions and credits taken. The courts have held that income accrued prior to the death of a decedent on the cash basis is not income to his estate, and under the present law, unless such income is taxable to the decedent, it escapes income tax altogether. By the same reasoning, expenses accrued prior to death cannot be deducted by the estate. Sections 42 and 43 of the House bill were so drawn as to require the inclusion in the income-tax return for the decedent of all items of income and deductions accrued up to the date of death regardless of the fact that the decedent may have kept his books on a cash basis. The change made in section 43 is necessary to effectuate the policy adopted in the House bill in section 42 ................"

venting ordinary income from escaping taxation. Previously, whenever a taxpayer on a cash receipts and disbursement basis died, income accrued up to his death passed to the estate as a part of the corpus, escaping the income tax mill altogether. Sec. 42, enacted to cover the situation, "includes" in taxable income "for the taxable period in which falls the date of his [taxpayer's] death, amounts accrued up to the date of his death". Thus the taxable income for such period is the income of the taxpayer actually received, plus the income accrued but not received. The objective of Congress, which must always be kept in mind, is that the net income of the taxpayer, prior to his death, bear the burden of income taxes, regardless of his tax basis, or whether he kept books, and that the income accrued should be added to the income actually received.

■■ On the other hand it is evident that in subjecting such additional income to taxation, Congress intended to permit additional deductions to such taxpayers. Sec. 43 makes allowable "deductions * * * for the taxable period in which falls the date of his [taxpayer's] death, amounts accrued up to the date of his death * * *." This could only mean such deductions that were not allowable to a taxpayer on a cash basis prior to the enactment of sec. 43. The purpose of Congress was to see reflected in the return of such decedent credits and deductions which had accrued, whether reflected on the books of the taxpayer or not. It required sec. 43 to remove what would be an otherwise unjust burden resulting from sec. 42. There is nothing contained in secs. 42 and 43 indicating that the provisions in sec. 23 (k) relating to the ascertainment of a debt to be worthless within the taxable year and its charge-off are dispensed with. These two requirements are embedded in the tax laws and are necessary to be met before bad debts become deductible items.

In this view, we cannot agree with petitioners that sec. 23 (k) should be eliminated in the computation of the George Herder return, and we cannot follow them in their desire for such elimination, since it is solely through sec. 23 (k) that bad debts are allowed to be deducted from gross income; nor can we conclude that secs. 42 and 43 abolish the books kept by the taxpayer.

■ However, we can agree that the tax basis of George Herder was modified as a result of his death. In his lifetime he was upon a cash receipts and disbursement basis, keeping books of account. In this position he had until the last day of the taxable year in which to determine the worthlessness of the debts and to charge them off. He died within the taxable year without having done either. Secs. 42 and 43 changed his basis. The change was not of his choosing. He died and the law changed it for him. Sec. 23 (k) applies to a taxpayer regardless of his basis. The debts must become worthless within the taxable year. The worthlessness of the debt is a fact to be determined—not the opinion of the taxpayer.[6] This essential was met by the personal representatives of George Herder. The correctness of their conclusion as to their worthlessness within the taxable year is here admitted. The Board so found. Thus sec. 23 (k) in this respect has been complied with.

■ We come to the charge-off. George Herder did not charge these debts off the books which he kept. He could not do so because they were not worthless to him. If the debts had actually become worthless during the first period, his failure to charge them off on the books would not, in our opinion, have precluded their deduction from gross income. In such a situation, they would have become an accrued deduction which sec. 43 permits to be reflected in the taxable income, and the charge-off within his taxable period, required by sec. 23 (k) would be made by operation of law. But the debts involved in the present case were not worthless within the taxable period. It is admitted, and found by the Board that they became worthless only upon the death of George Herder. Consequently, they cannot be accrued as a deduction under sec. 43 and, in our opinion, may not be deducted in the George Herder return. We therefore affirm the Board's determination in this respect.

### The Mary Herder Return

■ Mary Herder made her tax return for the full calendar year 1934. What we have said in respect of the worthless debts in connection with the return of George Herder for the first period equally controls Mary Herder for the same period.

---

6 H. D. Lee Mercantile Co. v. Com'r, 10 Cir., 79 F.2d 391; Avery v. Com'r, supra; Higginbotham-Bailey Logan Co. v. Com'r, 8 B.T.A. 566.

The books for the community were kept by George Herder, and throughout the years debts were ascertained to be worthless and charged off. George Herder fixed the basis of the community while it existed and, as there is nothing in the record indicating that Mary Herder had income other than that received from the community, her basis for the period prior to his death, was determined by the basis fixed for the community. However, upon the death of George Herder the community terminated and Mary Herder became a new taxpaying personality, with the right to elect upon what basis she would make her returns, as well as to determine whether or not she would keep books. In her new status deductibility of the debts involved depends upon whether she kept books.

The Board found that after George Herder's death his books were kept by R. L. Williams "for the executors of the estate of the decedent and for Mary Herder"; that "no other books of account were kept by or for the decedent, the executors of his estate, or Mary Herder".

Whenever there is substantial evidence to support a finding of the Board upon a question of fact, its decision of that question is conclusive upon review.[7] In our opinion, there is no evidence in the record before us that Mary Herder kept any books of account for this or any period, nor can we find any evidence supporting the finding that any books were kept for her. R. L. Williams married a daughter of George and Mary Herder. He was also the owner of a one-third interest with George Herder in the partnership operating a rice mill. He managed the rice mill and in this connection kept books for the partnership. He did not keep books for George Herder, or for the community while it existed. Because of its pertinence, we set out in the margin his testimony relating to his bookkeeping.[8]

The accountant, Moore, testified that he "prepared his [George Herder's] income returns until his death" and "prepared the income tax returns after his death for him, for his estate, and those of Mrs. Herder for several prior years."

We cannot conclude that this evidence supports the Board's findings that Mary Herder kept books, or that Williams, authorized or unauthorized, kept books for Mary Herder.

The record does not disclose who prepared the return for 1934, but, assuming that Mary Herder's return was based upon information disclosed in the books kept by Williams, there still is no evidence in the record that she, who had

[7] Helvering v. Tex-Penn Oil Co., 300 U. S. 481, 490, 57 S.Ct. 569, 81 L.Ed. 755; Elmhurst Cemetery Co. v. Com'r, 300 U. S. 37, 40, 57 S.Ct. 324, 81 L.Ed. 491; General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 206, 56 S.Ct. 185, 80 L.Ed. 154; Helvering v. Rankin, 295 U. S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343.

[8] "After his death, I have kept the books and records in connection with the liquidation and handling of his estate. I was familiar with notes and accounts due to him and handled them for the estate. "I have here my book of accounts, listing notes due to George Herder * * *

"My record book of account of notes receivable showed unsecured notes due from Matthews Brothers, * * *

"My book here shows that a value of $2,000 was placed upon these notes, and I am reasonably sure the difference was charged off in 1934 after the death of Mr. Herder. The book does not show any of these notes were charged off. It is just a list, but I know that they were charged off.

"I have W. R. Terrill down in my book for several notes. * * * "

* * *

"Q. Have you an account receivable against Emil Herder?

"A. I think that was in the shape of an account receivable, and I believe that it is on Mr. Herder's book. I did not transfer that to the new book (at this point the witness looks and gets another book from among his records.) Yes, Mr. Herder's individual ledger, in that book, and not in this book (indicating first book) he shows an account receivable against Emil Herder—page 115 of the individual ledger of Mr. George Herder, Senior—in the total amount of $2,298.53 composed of three items—the addition of three items— * * *

"I only kept Mr. Herder's books after his death and did not know their details previously. During his life Mr. Herder kept his own records. * * * "

"For the income tax returns for the estate or widow I only furnished the books and data. I was generally familiar with their problems."

Referring to the Herder Rice Milling Co., witness said: "I had charge of the books and records."

a right of election in respect thereto, kept books of account upon which her personal return was based. Appeal of Brander, 3 B.T.A. 231, 235. It follows that, if she kept no books of account, or if none were authorized to be kept for her, there was no way in which she could show an actual charge off of the bad debts upon books, nor was there any responsibility under the statute for her so doing. All required of her would be to claim their deduction upon her tax return for the period in which the debts became worthless, which she did. There is no contention by the Commissioner that such debts may not be deducted in the tax return for the period in which they are so ascertained to be worthless. They are so deductible.[9] Therefore, we are of the opinion that one-half of the amount of the debts involved, to-wit, $12,796.53 is properly deductible by Mary Herder in her return for the taxable year 1934.

The Proceeds of the Insurance Policy

On January 15, 1934, prior to the death of George Herder, fire destroyed the milling property owned by the partnership. For this loss, the partnership received, in settlement of insurance claims under policies carried by it, $50,000. Such amount was immediately distributed to the partners, being pro-rated in accordance with their respective interest in the partnership, namely, two-thirds to George Herder, and one-third to R. L. Williams.

The Board found that George Herder received $33,333.67 under such distribution and that $19,199.50 thereof represented his portion of the total amount received by the partnership in excess of the adjusted cost basis of the property (original cost, plus improvements, less accrued depreciation) at the time of its destruction, (hereinafter referred to as proceeds) and that such proceeds were taxable as ordinary income to the community.[10]

The personal representatives of George Herder, deceased, maintain (a) that it is not income taxable to the community, but that it is income taxable to the estate of George Herder; and, further (in which Mary Herder as an individual joins) that (b) the proceeds received is not ordinary income, but is a capital gain from the sale or exchange of a capital asset and should be taxed as such.

(a) In contending that the proceeds received was not taxable in the first period, the personal representatives rely upon sec. 112 (f).[11] They urge that the record shows, and the Board finds, that George Herder had definite intentions, from the time he received such proceeds until his death, to reinvest the whole amount thereof in similar property, thereby coming within the provisions of sec. 112 (f), in which event no gain or loss would occur in such taxable period. They urge that the Board's determination as to the disposition of the proceeds received by R. L. Williams, a member of the partnership, bears them out in this contention.

The Board found that Williams had similar intentions of reinvesting his portion of the proceeds in similar property; that he made bona fide efforts so to reinvest, but did not actually reinvest such proceeds until a date 14 months subsequent

---

9 Jones v. Com'r, 7 Cir., 38 F.2d 550; Perry v. Com'r, 22 B.T.A. 13; Brown v. United States, 3 Cir., 95 F.2d 487; People's-Pittsburgh Trust Co. v. United States, Ct.Cl., 10 F.Supp. 139; Redfield v. Com'r, 34 B.T.A. 967; Stephenson v. Com'r, 8 Cir., 43 F.2d 348; Shiman v. Com'r, 2 Cir., 60 F.2d 65.

10 "Sec. [§] 111. (a) Computation of gain or loss. The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113 (b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized." 26 U.S.C.A. § 111(a).

11 "Sec. [§] 112. (f) Involuntary conversions. If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended." 26 U.S.C.A. § 112(f).

to receiving it. The Commissioner had refused Williams the application of sec. 112 (f) to such funds; the Board found that the section should apply. His return is not before us.

A very persuasive argument is presented that inasmuch as the Board permitted the benefits of sec. 112 (f) to extend to Williams, they should likewise apply the same treatment to George Herder, deceased, who had like intentions of reinvestment, but was prevented from actually doing so because of his death. The only authority cited in this connection is Buckhardt v. Commissioner, 32 B.T.A. 1272, in which actual reinvestment was made.

If, as we view it, the proceeds is income to the taxpayer prior to his death, it is taxable in the period when it is received, and can only be relieved from taxation by compliance with sec. 112 (f), that is by actual reinvestment in similar property as required thereunder. The Board's action in applying sec. 112 (f) and its benefits to Williams in the present case and to Buckhardt in the case cited above cannot have any effect on the taxability of George Herder's income in the absence of any reinvestment at all. Sec. 112 (f) is a liberal provision which may remove such income from a taxable status within the period when it was received. It is based upon the theory that taxation is deferred until a subsequent date, but only upon condition that there is a reinvestment of such income in similar property, which takes the basis for gain or loss of the property involuntarily converted. We are of the opinion that the proceeds of the insurance was taxable income received in the prior period, and, not having been reinvested, sec. 112 (f) cannot be availed of to avoid payment of taxes in the period the income was received. Upon the· death of George Herder, the proceeds constituted a portion of his estate and could not be taxed as income derived by the estate.

(b) Petitioners very strongly urge that the taxable income growing out of the involuntary conversion of the mill, should not be, in any event, treated as ordinary income, but should be treated as a capital gain and subjected to taxation under sec. 117.[12] They contend that the definition of "sale or exchange" of the capital gain and loss section, of the statute is widened by sec. 117 (f),[13] and that under its provisions liquidated insurance proceeds come within its terms. They argue that "the payment of $50,000 herein is only incidentally according to the terms of insurance policies, and is in fact a payment of a liquidated claim arising upon occurrence of the total loss by fire." Thus it is their theory that the present case "is to be decided in its actual aspect as involving a 'sale or exchange' giving rise to a capital gain."

It is obvious that the proceeds of the fire insurance policy did not result from either a sale or exchange of property.[14] This payment is· the satisfaction of a contract of insurance indemnifying against contingent loss by fire.[15] It is true that in the Revenue Act of 1934 new language found its way into the law under sec. 117 (f) broadening the scope of the capital gain and loss section, but this language, as we read it, is not helpful to the petitioners in the present situation. It seems to us to be clear that sec. 117 (f) cannot refer to a fire insurance policy, even when a liquidated demand is paid under it. The petitioners would construe the terms of the

[12] Revenue Act, 1934, c. 277, 48 Stat. 680, Sec. 117, 26 U.S.C. § 101, 26 U.S.C. A. § 101.

[13] Sec. 117. (f) "Retirement of bonds, Etc. For the purposes of this title, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor."

[14] Jackson v. McIntosh, 5 Cir., 12 F. 2d 676, certiorari denied 273 U.S. 697, 47 S.Ct. 93, 71 L.Ed. 846; Iowa v. Mc-

Farland, 110 U.S. 471, 4 S.Ct. 210, 28 L. Ed. 198; Butler v. Thomson, 92 U.S. 412, 23 L.Ed. 684; Commissioner v. Freihofer, 3 Cir., 102 F.2d 787; Hale v. Helvering, 66 App.D.C. 242, 85 F. 2d 819; Herring Motor Co. v. Ætna Trust & Sav. Co., 87 Ind.App. 83, 154 N.E. 29; Hartwig v. Rushing, 93 Or. 6, 182 P. 177; Grace v. McDowell, 60 Or. 577, 120 P. 413.

[15] Brock v. Hardie, 114 Fla. 670, 154 So. 690; Atlantic Steel Co. v. Hartford Fire Ins. Co., 39 Ga.App. 680, 148 S.E. 286; Mack v. Liverpool & London & Globe Ins. Co., 329 Ill. 158, 160 N.E. 222, 57 A.L.R. 1039; Meyer v. Building & Realty Service Co., 209 Ind. 125, 196 N.E. 250.

statute "other evidences of indebtedness issued by any corporation * * * with interest coupons or in registered form" to include a fire insurance policy for the reason that in case of total loss the policy by statute "shall be held and considered to be a liquidated demand against the company for the full amount of such policy." Vernon's Ann.Civ.Texas Statutes, Art. 4929. Taking this section, 117 (f), in its entirety, as we must, we are unable to agree with them. The fire insurance policy, in our opinion, is not an evidence of indebtedness contemplated by this section. It would seem to us, from its position in the text, that "other evidences of indebtedness" refers to something more closely akin to bonds, debentures, notes and certificates. Were the language of this section ambiguous, the report of the committee handling the legislation may be used in a search for "the voice of Congress."[16] As the insurance policy does not come within the purview of sec. 117, or subdivision (f) thereof, the Board properly treated the proceeds from it as ordinary income and not as capital gain.

## Adjusted Cost Basis

Further the petitioners maintain that whether the proceeds are taxable as ordinary income to the community or should be treated under the capital gain section, the Commissioner and the Board have erred in their method of computation in determining the adjusted cost basis of the property. They make three contentions in their effort to show error:

1. That certain expenditures treated as ordinary expenses should be considered as capital expenditures.

2. That failing to take amounts allowable as deductions for depreciation on their returns for prior years, these expenditures should be permitted to off-set depreciation, and no depreciation should be considered in computing the adjusted cost basis.

3. And, further, that the marketable value should be used in a computation of the adjusted cost basis, rather than the original cost of the property, plus additions.

It is well settled that the burden of proof is on the taxpayer to show that the commissioner's determination is invalid.[17] This rule has often been applied in controversies over the proper cost basis in the computation of gains from sales and exchanges of property.[18] In this instance, the taxpayer has not pointed out the specific items improperly charged to expenses, and in our opinion, has failed to support this burden.[19] However, notwithstanding the petitioners failure in this respect, we have made a careful analysis of the method used in the determination of the adjusted cost basis to the taxpayer of the property involved, and find that proper credits have been allowed for all capital expenditures during such period; that the amounts expended for repairs, maintenance and similar items, now sought to be capitalized by the petitioners, were properly considered as ordinary expenses, and deducted as such in their prior annual returns.

2. The adjusted cost basis is defined by the statute to be:

"Sec. [§] 113. Adjusted basis for determining gain or loss.

*   *   *   *   *   *

"(b) *Adjusted basis.* The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

"(1) *General Rule.* Proper adjustment in respect of the property shall in all cases be made—

*   *   *   *   *   *

"(B) * * * for exhaustion, wear and tear * * * to the extent allowed *(but not less than the amount allowable)*

---

16 H. Report, 704, note 5, supra: "Subsection (f) provides that amounts received upon the retirement of corporate bonds and *similar* evidences of indebtedness shall be considered as amounts received in exchange therefor." (Italics supplied)

17 Continental Oil Co. v. Helvering, 69 App.D.C. 236, 100 F.2d 101; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Lucas v. Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848; Wickwire v. Reinecke,

275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184.

18 Wells Fargo Bank & Union Trust Co. v. McLaughlin, 9 Cir., 78 F.2d 934; Rieck v. Heiner, 3 Cir., 25 F.2d 453. Cf. Smith v. Dean, D.C., 52 F.2d 291; Joseph S. Wells Ass'n v. Helvering, 63 App.D.C. 254, 71 F.2d 977; Peerless Investment Co. v. Com'r, 9 Cir., 80 F.2d 427.

19 See, Autosales Corp. v. Com'r, 2 Cir., 43 F.2d 931, 937.

under this Act or prior income-tax laws. * * *" (Italics supplied) 26 U.S.C.A. § 113(b).

Subsection (a) referred to in the above provides "The basis of property shall be the *cost* of such property," with exceptions not material. (Italics supplied)

■ In determining the adjusted cost basis of property sold, exchanged or otherwise disposed of it is immaterial whether petitioners availed themselves of allowable deductions for depreciation in their prior tax returns. Failing to take depreciation when it occurs in the prior taxable years does not prevent its inclusion in the determination of the adjusted cost basis of the property.[20]

■ 3. The petitioners point out that the marketable value of the property at the time of its destruction was $75,000 and that it is from this sum that the depreciation, if any, should be deducted. Again we turn to the statute. It is not the marketable value of this property that enters into the computation, it is the original cost, plus additions that must be used. Sec. 113 (b), supra. Such original cost, plus additions to capital, less depreciation results in the statutory term—the adjusted cost basis.

In this case the amount received under the fire insurance policy was $50,000. The adjusted cost basis, taking into consideration the amount received by the partnership for the salvage was properly found by the Board to be $21,200.74. The difference between these two sums, to wit, $28,799.26 reflects the taxable realization on the transaction. We affirm the Board in this respect.

No. 7179—affirmed.

No. 7180—affirmed in part and reversed in part, and remanded to the United States Board of Tax Appeals for proceedings in accordance with the opinion.

---

[20] United States v. Ludey, 274 U.S. 295, 304, 47 S.Ct. 608, 71 L.Ed. 1054; Kittredge v. Com'r, 2 Cir., 88 F.2d 632.