## CAMMACK v. UNITED STATES (two cases).

### Nos. 11594, 11595.

Circuit Court of Appeals, Eighth Circuit.

July 23, 1940.

---

E. F. Hoeschen, of St. Paul, Minn. (C. C. Goodson, of St. Paul, Minn., on the brief), for appellants.

Carlton Fox, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and John J. Pringle, Jr., Sp. Assts. to the Atty. Gen., and Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for appellee.

Before GARDNER and SANBORN, Circuit Judges, and COLLET, District Judge.

SANBORN, Circuit Judge.

These appeals are from judgments in favor of the United States in actions brought by taxpayers seeking to recover alleged overpayments of income taxes for the year 1932. The issues of fact and of law in both cases were substantially identical, and they were tried together before the court without a jury. The broad question presented is whether losses actually suffered by the taxpayers in the year 1932, due to the fact that investment securities owned by them which were known as "American Certificates" of the Kreuger & Toll Company of Sweden became worthless in that year, were deductible in computing net income for 1932.

The Kreuger & Toll Company had issued in Sweden participating debentures, which contained a promise to pay the holder of each debenture twenty kronor at the times and in the manner specified in the debenture. "These debentures were issued in Swedish currency (kronor) in denominations of 20 kronor each (about $5) and in multiples thereof. There was no promise to pay the principal at any fixed date but the debt may be extinguished by (a) on or after July 1, 2003, the holder of a participating debenture calling for payment at par with interest; (b) the company's redeeming on three months notice published as described." In re Aktiebolaget Kreuger & Toll, 2 Cir., 96 F.2d 768, 769. On liquidation the debentures were redeemable before any distribution of assets to stockholders but after all of the debts of the company had been paid. The debentures bore interest at five per cent, but provided for additional interest at one per cent for each one per cent paid on the ordinary shares of the company in excess of five per cent. Interest was due July first in each year upon surrender of an interest coupon. Principal and interest were payable in kronor at the office of the company in Stockholm or, at the option of the holder, in sterling in London. Some of these debentures were deposited with a trust company in the United States under a deposit agreement, and it issued its "American Certificates" against these deposited debentures. The certificates, each of which represented ownership of twenty Swedish crowns par value of the deposited debentures, were listed on the New York Stock Exchange and were dealt in as stocks. See 96 F.2d 768, 769.

Ivar Kreuger, who was the chairman of the board of directors and the dominant head of Kreuger & Toll, committed suicide on March 12, 1932. An audit dated March 31, 1932, disclosed that assets carried on the books at $450,000,000 were worth about $204,000,000; that book earnings from January 1, 1918, to March 31, 1932, of 1,179,357,000 kronor were actually 150,962,000 kronor, or about $270,000,000 less than shown by the books. A report of September 9, 1932, compiled by the liquidators appointed by the Swedish government, showed total assets of the company to be insufficient to pay the secured and general creditors, leaving nothing whatever for the holders of participating debentures. Subsequent developments disclosed that Ivar Kreuger had misappropriated about $110,000,000 of the funds of the company. A final report of examination by American auditors of "the entire Kreuger group of companies," dated November 28, 1932, and covering the period

of 1917 to March 31, 1932, showed that of $770,400,000 received from the public and from banks, $179,100,000 had been paid out as interest on debentures and as dividends to stockholders, $115,800,000 had been taken by Ivar Kreuger, and the balance had been invested in securities, in associated companies and in monopoly concessions; and that the earnings had been overstated on the books to the extent of $275,600,000. The Kreuger & Toll Company was adjudicated a bankrupt in Sweden on May 24, 1932, and in the United States District Court for the Southern District of New York on August 6, 1932. On the New York Stock Exchange the "American Certificates" were quoted at about $9 on January 26, 1932. They were quoted at about $.03 on May 25, 1932. The last quotation, on January 26, 1933, was approximately $.03, and that is the last record of any transaction in such certificates on the Exchange. There can be no doubt that the "American Certificates" became worthless in 1932, and that their worthlessness was a matter of common knowledge. See Ridgway v. Commissioner, 35 B.T.A. 122.

Each of the taxpayers kept a stock and bond register in the nature of a loose-leaf memorandum book, which contained a record of stocks and bonds owned, with the date of purchase, the purchase price, and, if and when sold, the date of sale and the selling price. The "American Certificates" which each had purchased were recorded in his book. Each taxpayer in 1932 concluded that his "American Certificates" had become worthless. In December, 1932, the taxpayers, who lived in St. Paul, Minnesota, caused inquiry to be made at the office of the Collector of Internal Revenue in that City as to whether the loss of their investments in the certificates would be recognized as a deductible loss for 1932, and were advised that if such losses were taken as deductions for that year they would not be allowed. In filing their income tax returns for the year 1932, the taxpayers, for that reason, did not include the losses on their "American Certificates" in their deductions. They made no notations during 1932 in their stock and bond registers evidencing their determination that the certificates had be-

come worthless and they did not mark them "charged off". It was not shown that they realized that the certificates were debts nor that they had ever entered any "charge-offs" of securities in these books. They kept no regular books of account.

On January 8, 1935, the Commissioner of Internal Revenue issued a special report to the effect that "the entire cost of the Participating Debentures, represented in this country by 'American Certificates' could be written off in 1932, provided the taxpayer had complied with the statute regarding bad debts." These taxpayers thereafter filed amended returns for 1932, deducting their losses upon their "American Certificates" as bad debts, and made claims for refund. In the spring of 1935, an agent of the Bureau of Internal Revenue examined the memorandum books of the taxpayers and noted that the certificates had not been charged off. He informed them that the certificates were bad debts required by law to be charged off. Thereupon each taxpayer noted in the book that the certificates had been charged off in 1932. In 1936 the Commissioner denied the claims for refund on the ground that the certificates were bad debts ascertained to be worthless in 1932 but not charged off in that year.

The court below found the facts in each case to be substantially as we have stated them. It found that neither taxpayer made an entry in his memorandum book in 1932, 1933 or 1934 indicating "that the certificates were worthless and charging them off or indicating that plaintiff was abandoning the asset as having no value," and that neither took a deduction on account of the worthlessness of the certificates in his return for 1932, 1933 or 1934. The court concluded that each taxpayer had ascertained that the "American Certificates" were worthless in 1932 but that he had not charged them off in that year and was therefore not entitled to recover.

The taxpayers make two contentions: (1) That the "American Certificates" were not debts, and that the taxpayers' losses were deductible under § 23(e) (2) of the Revenue Act of 1932; c. 209, 47 Stat. 179, 180, 26 U.S.C.A. Int.Rev.Acts, p. 489.[1]    (2) That if the "American Cer-

---

[1] "Sec. [§] 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

*    *    *    *    *    *

"(e) *Losses by Individuals.* Subject to the limitations provided in subsection (r) of this section, in the case of an individ-

tificates" were debts, they were ascertained to be worthless and charged off within the meaning of § 23(j) of the Revenue Act of 1932.[2]

While there is force in the appellants' contention that the "American Certificates", representing an interest in the deposited participating debentures of the Kreuger & Toll Company, were not debts, it is apparent that the certificates evidenced the ownership of a low form of indebtedness of that company having many of the attributes of a preferred stock but containing a promise to pay interest and also a promise to pay principal in the distant future on demand. We shall, for the purposes of this opinion, accept the determination of the Commissioner and of the court below that the certificates were debts.

If the words "charged off within the taxable year", as used in § 23(j), refer to the making of an entry in writing upon books or records, the court below correctly ruled that there was no charge-off of the "American Certificates" by the taxpayers in the year 1932. If, however, the words refer to a definite conclusion reached by the taxpayer during the taxable year that a debt has become valueless and is no longer to be regarded, or carried for any purpose, as an asset having· value, then we think the court reached an erroneous conclusion.

■ It is to be noted that the statute does not specify how or in what way a debt is to be charged off. "No formal requirement as to what' will constitute an actual charging off of a worthless debt seems to prevail." Stephenson v. Commissioner, 8 Cir., 43 F.2d 348, 351. It' is not reasonable to suppose that it was intended

by Congress that the deductibility of a bad debt was to depend upon whether a taxpayer kept books or upon what kind of books he kept. What the statute requires, we think, is that a taxpayer claiming a deduction for a bad debt shall be able to show that the debt was ascertained to be worthless during the taxable year and that he, during that year, recognized and accepted the fact that it was worthless and did not thereafter regard it, or treat it, as an asset having value.

■ It has been consistently held that a taxpayer who keeps no books of account may take a deduction for a bad debt without making any written notation of a charge-off, provided he takes the deduction in his return for the year in which the debt was ascertained to be worthless.[3]

In Stephenson v. Commissioner, 8 Cir., 43 F.2d 348, 351, this court said: "The testimony was that no books were kept by any one in connection with the pool except a record of receipts and disbursements. No formal requirement as to what will constitute an actual charging off of a worthless debt seems to prevail. Where the taxpayer, acting in good faith, and in accordance with the fact, forms a mental determination, during the taxable year, under the circumstances here present, to charge off a worthless debt, there has been compliance with the statute."

In Herder v. Helvering, 70 App.D.C. 287, 106 F.2d 153, 159, the court said: "It follows that, if she [the taxpayer] kept no books of account, or if none were authorized to be kept for her, there was no way in which she could show an actual charge off of the bad debts upon books, nor was there any responsibility under the

---

ual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\* \* \* \* \* ■

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or \* \* \*"

[2] "(j) *Bad Debts.* Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

[3] Herder v. Helvering, 70 App.D.C. 287, 106 F.2d 153, 159; Brown v. United States, 3 Cir., 95 F.2d 487, 489; Shiman v. Commissioner, 2 Cir., 60 F.2d 65, 67; Stephenson v. Commissioner, 8 Cir., 43 F.2d 348, 351; Jones v. Commissioner, 7 Cir., 38 F.2d 550, 554; McManus v. Eaton, D.C., 7 F.Supp. 380, 382; Redfield v. Commissioner, 34 B.T.A. 967, 974; Pryibil v. Commissioner, 31 B.T.A. 164, 166; Perry v. Commissioner, 22 B.T.A. 13, 18–20; Corbett v. Commissioner, 15 B.T.A. 698, 704, affirmed 60 App.D.C. 202, 50 F. 2d 492; Spencer v. Commissioner, 21 B. T.A. 859, 861; Mitten v. Commissioner, 11 B.T.A. 731, 733; Newton v. Commissioner, 7 B.T.A. 1153, 1155; Fraser v. Commissioner, 6 B.T.A. 997, 1002.

statute for her so doing. All required of her would be to claim their deduction upon her tax return for the period in which the debts became worthless, which she did."

In Mitten v. Commissioner, 11 B.T.A. 731, 733, the Board of Tax Appeals said: "He found it [the debt] to be worthless and it appears from the evidence that it was in fact worthless. As he kept no books of account no formal book entry of charge-off as mentioned in the statute was necessary in his case."

In Shiman v. Commissioner, 2 Cir., 60 F.2d 65, 67, the court said: "Shiman kept no books and could 'charge off' nothing in the usual sense. The phrase was apparently introduced to prevent a taxpayer from reserving a loss at his option until his income was large and his surtax high (Avery v. Commissioner [5 Cir.], 22 F.2d 6, 55 A.L.R. 1277), but it was not meant to limit deductions to persons whose affairs were formally managed. Some courts have indeed gone so far as to say that a mere unexpressed determination to abandon the debt is enough. Jones v. Commissioner [7 Cir.], 38 F.2d 550; Stephenson v. Commissioner [8 Cir.], 43 F.2d 348. Possibly that would not suffice (article 151, Regulations 65), but here it seems to us that Shiman's examination of Oppenheim with the view of learning whether he could collect, his failure to discover any assets and his abandonment in fact of any effort, must be taken as determining the loss 'by a closed and completed transaction,' in the language of article 151. He had 'charged off' the debt, so far as he could do so without some formal declaration. * * * Unless we are to confine the phrase to entries in books of account, this situation is as good as we are likely to find."

In O. S. Stapley Co., Inc., v. Commissioner, 13 B.T.A. 557, 559, 560, the Board used the following language: "While we have held that the statute is clear and unambiguous as requiring that the accounts must be charged off, we have not required, nor do we think the statute contemplates, any particular method of accomplishing this purpose. In other words, we have recognized that accounting and bookkeeping systems are far from being standardized and that the 'charge-off' may be effected in a variety of ways and yet be sufficient for substantial compliance with the statute which is all we consider necessary. As we said in Mason Machine Works Co., 3 B.T.A. 745, 'It is not the physical act done within the year to which Congress has referred, but to the setting up of evidence of the ascertainment of worthlessness substantially as of the date of such ascertainment and in confirmation thereof.'"

And in Appeal of Collin, 1 B.T.A. 305, 308, the Board said:

"The connotation is irresistible that in using the words 'charged off', Congress referred to that which had been charged on. We do not believe that any other construction would be tenable, nor do we believe that in so reading the statute there has been grafted on the statute any provision beyond the clear import of the language used.

"The mechanical process of keeping accounts is not prescribed by statute. Such accounts may be recorded in an elaborate set of books, or in mere memoranda, or be recorded only in the brain of the taxpayer. It can make no difference as to the form of such operation."

■ It has been established that a taxpayer who keeps regular books of account may take a deduction for a bad debt although he made no actual entry of a charge-off upon his books during the year the debt was ascertained to be worthless, provided he made the entry shortly after the end of the year and before the books for the year were closed.[4]

■ It is our conclusion that the question of whether a debt ascertained to be worthless has been charged off is one of fact to be determined from the circumstances of each case. Where it appears that the taxpayer has made a practice of keeping full and accurate books of account in which are entered all debts due him, and upon which entries of charge-offs are ordinarily made, and which are intended to show all assets and liabilities, his failure to make an entry showing that a bad debt was charged off during the taxable year

4 Malden Trust Co. v. Commissioner, 1 Cir., 110 F.2d 751, 752; Rockwell Mfg. Co. v. Commissioner, 19 B.T.A. 277, 279; Imperial Furniture Co. v. Commissioner, 9 B.T.A. 713, 718, 719; State Bank v. Commissioner, 8 B.T.A. 878, 881; Mosher Mfg. Co. v. Commissioner, 7 B.T.A. 187, 194, 196; Appeal of Mason Machine Works Co., 3 B.T.A. 745, 750.

will ordinarily preclude him from seeking a deduction therefor, since his failure would constitute strong, if not conclusive, evidence that the debt had not been "charged off". Where the taxpayer keeps no books, his failure to make a written notation or record that a debt ascertained to be worthless had been charged off would constitute no evidence that he had not charged off the debt, although his failure to claim the deduction in his tax return for the year in which the debt became worthless would be evidence that it had not been charged off in that year. No doubt the failure of a taxpayer who keeps a memorandum book in which he lists securities owned by him, to make some notation indicating the elimination of a worthless debenture from that list, if coupled with a failure to claim a deduction in his tax return for the year in which the debenture was ascertained to be worthless, would usually justify a finding that he had not charged it off. In these cases, however, the failure of the taxpayers to make notations in 1932 that their "American Certificates" were charged off and to claim their deductions on that account from income of that year is completely explained. It was due to the fact that they had been reliably advised that the Commissioner of Internal Revenue would not recognize their losses as allowable deductions for that year. Their explanation destroyed any unfavorable inference that might otherwise be drawn from their failure in 1932 to note a charge-off on their lists and from not claiming a deduction in their original returns for 1932. The fact that they made the inquiry of the Collector corroborates their claim that they recognized and determined in 1932 that these "American Certificates" were worthless.

It is our conclusion that the evidence in these cases is consistent with only one hypothesis, which is that the "American Certificates" became utterly worthless in the year 1932; that their worthlessness was a matter of common knowledge and was known and recognized by the taxpayers in the year 1932; and that, during that year, they mentally charged them off as being worthless, and at no time thereafter regarded or carried them as assets having any value.

Under the evidence and the findings of fact of the court below, we think that a judgment should have been entered in favor of each taxpayer. The judgments appealed from are reversed and the cases are remanded, with directions to enter judgments accordingly.